IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| WILLIAM H. THOMAS, JR., )<br><br>    Plaintiff, )<br>           )<br>v.          )<br>           )<br>JOHN SCHROER, Commissioner of )<br>Tennessee Department of )<br>Transportation, in his )<br>individual capacity; and JOHN )<br>REINBOLD; PATTI BOWLAN; ROBERT )<br>SHELBY; SHAWN BIBLE; and )<br>CONNIE GILLIAM, in their )<br>individual capacities, )<br>           )<br>    Defendants. )  | No. 2:13-cv-02987-JPM-cgc |

ORDER GRANTING PRELIMINARY INJUNCTION

On June 24, 2015, the Court entered an order granting
Plaintiff Thomas' motion for an emergency temporary restraining
order ("TRO"). (ECF No. 110.) On July 14, 2015, the Court held
a preliminary injunction hearing to determine whether to convert
the existing TRO into a preliminary injunction. (ECF No. 125.)
For the reasons that follow, the Court GRANTS the preliminary
injunction.

I.     BACKGROUND

This case concerns alleged violations of Plaintiff William
H. Thomas Jr.'s constitutional rights. Thomas alleges the
Tennessee Department of Transportation ("TDOT") violated his
First, Fifth, and Fourteenth Amendment rights when it removed

1

certain of Thomas' billboards and signs displaying noncommercial content pursuant to the Billboard Regulation and Control Act of 1972 ("Billboard Act"), as set forth at Tennessee Code Annotated §§ 54-21-101, et seq. Thomas asserts that signs displaying noncommercial content are exempt from permit requirements pursuant to Tenn. Code Ann. § 54-21-107(a)(1) (2008).

A.    Procedural Background

On December 17, 2013, Thomas filed a complaint against all Defendants. (ECF No. 1.) On February 3, 2014, Defendants filed their first motion to dismiss for lack of jurisdiction. (ECF No. 12.) Defendants moved to dismiss, inter alia, claim no. 4 for declaratory relief as to the Crossroads Ford sign. (Id. at 1.) On March 10, 2014, Defendants filed their answer to the initial complaint. (ECF No. 17.) The Court granted Thomas leave to amend the complaint as to the claim for retaliation, and dismissed as moot in part Defendants' motion to dismiss. (ECF No. 34.) Thomas filed an amended complaint on October 1, 2014. (ECF No. 38.)

On October 10, 2014, Thomas filed an emergency motion for temporary restraining order. (ECF No. 39.) On October 13, 2014, Defendants filed a motion for dismissal of amended complaint. (ECF No. 40.) The Court denied Thomas' emergency motion for temporary restraining order as moot on October 15, 2014. (ECF No. 43.)

On October 27, 2014, Thomas filed a second amended complaint. (ECF No. 45.) Defendants filed a motion for partial dismissal of the second amended complaint on October 28, 2014. (ECF No. 46.) Thomas responded in opposition to Defendants' motion to dismiss on November 28, 2014. (ECF No. 57.) Defendants filed a reply to Thomas' response on December 15, 2014. (ECF No. 64.)

On May 22, 2015, Thomas filed a motion to amend the existing scheduling order and filed two motions to compel discovery. (ECF Nos. 86-88.) On May 22, 2015, Thomas' counsel filed a motion to withdraw as attorney (ECF No. 85), which the Court granted on June 15, 2015 (ECF No. 103). Thomas now proceeds pro se in the case. Thomas' motions to compel were referred to the Magistrate Judge for determination on June 19, 2015. (ECF Nos. 106-07.)

On June 10, 2015, Thomas filed an emergency motion for temporary restraining order, seeking to prevent Defendants from removing his sign at the Crossroads Ford location. (ECF No. 96.) Thomas also seeks to enjoin Defendants from executing any judgments "resulting [from] or associated with the Crossroads Ford billboard sign until such time as a hearing can be held on the issues . . . ." (Id. at 1.) On June 15, 2015, Defendants filed a response in opposition to the motion for TRO. (ECF No. 99.) On June 18, 2015, the Court held a motion hearing

regarding Thomas' TRO motion.  (ECF No. 104.)  On June 24, 2015, the Court entered an order granting Thomas' motion for emergency temporary restraining order ("order granting TRO").  (ECF No. 110.)

On July 8, 2015, Defendants filed supplemental briefing in opposition to issuance of a preliminary injunction.  (ECF No. 118.)  Thomas filed a reply brief in support of a preliminary injunction on July 13, 2015.  (ECF No. 124.)  The Court held a preliminary injunction hearing on July 14, 2015. (ECF No. 125.)

### B.    Factual Background

Defendants sought to have the Crossroads Ford sign removed through an ongoing enforcement action in Chancery Court in Shelby County, Tennessee.  (ECF No. 45 ¶ 27; see ECF No. 96-1 at PageID 1399-1404.)  In April and October of 2011, Defendants removed two of Thomas' outdoor advertising signs (the "Kate Bond" signs).  (ECF No. 45 ¶¶ 33, 37; ECF No. 79 ¶¶ 33, 37.)  In October 2014, Defendants removed another of Thomas' outdoor signs (the "Perkins Road sign"), even though, according to Thomas, "[the] billboard was displaying exclusively on-premise, noncommercial content and therefore exempt from the permitting requirements of T.C.A. § 54-21-107(a)(1)."  (ECF No. 45 ¶ 40; ECF No. 79 ¶ 40.)

On May 26, 2015, Thomas received a letter on behalf of TDOT stating that Thomas must remove the sign structure at the Crossroads Ford location by June 26, 2015. (ECF No. 96-1 at PageID 1399.) Thomas also received a proposed order of judgment "declaring an unlawful billboard to be [a] public nuisance and granting permanent injunction for removal of the unlawful billboard," to be subsequently submitted in Chancery Court in Shelby County, Tennessee. (Id. at PageID 1401-03.) Thomas filed the instant motion to prevent removal of the Crossroads Ford sign by TDOT.

## II.   STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). "Accordingly, a party 'is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.'" Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Camenisch, 451 U.S. at 395).

Four factors are used by the Sixth Circuit to determine whether injunctive relief is appropriate: (1) the likelihood of success on the merits; (2) whether the injunction will save the

plaintiff from irreparable injury; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction.  Id. at 542. "These four considerations are factors to be balanced, not prerequisites that must be met."  Id. (internal quotation marks omitted).

No one factor is dispositive; instead, the court must balance all four factors.  In re De Lorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985).  The burden of persuasion is on the party seeking the injunctive relief.  Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978).

## III. ANALYSIS

### A.   Strong Likelihood of Success on the Merits

Thomas asserts violations of four constitutionally protected rights as grounds for granting a TRO with regard to the Crossroads Ford sign: 1) First Amendment right to freedom of speech; 2) procedural due process; 3) substantive due process; and 4) equal protection under the law.  Because Thomas has established a strong likelihood of success on First Amendment grounds, the Court declines to address the remaining constitutional grounds asserted.

#### 1.   Content-Based Speech

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging

the freedom of speech.'" <u>Reed v. Town of Gilbert, Ariz.</u>, 135 S.
Ct. 2218, 2226 (2015) (quoting U.S. Const. amend. I  ).  The
government "'has no power to restrict expression because of its
message, its ideas, its subject matter, or its content.'"  <u>Id.</u>
(quoting <u>Police Dept. of Chicago v. Mosley</u>, 408 U.S. 92, 95
(1972)).  "Content-based laws . . . are presumptively
unconstitutional and may be justified only if the government
proves that they are narrowly tailored to serve compelling state
interests."  <u>Id.</u>

On June 18, 2015, the Supreme Court issued its opinion in
<u>Reed</u>, finding that certain exemptions to the town of Gilbert's
sign code were facially content-based and failed strict scrutiny
analysis.  In the <u>Reed</u> opinion, the Supreme Court laid out the
test for determining whether a provision regulating signage was
content-neutral or content-based.

> Government regulation of speech is content based
> if a law applies to particular speech because of the
> topic discussed or the idea or message expressed.
> <u>E.g.</u>, <u>Sorrell v. IMS Health, Inc.</u>, 564 U.S. ----, ----
> - ----, 131 S.Ct. 2653, 2663-2664, 180 L.Ed.2d 544
> (2011); <u>Carey v. Brown</u>, 447 U.S. 455, 462, 100 S.Ct.
> 2286, 65 L.Ed.2d 263 (1980); <u>Mosley</u>, <u>supra</u>, at 95, 92
> S.Ct. 2286. This commonsense meaning of the phrase
> "content based" requires a court to consider whether a
> regulation of speech "on its face" draws distinctions
> based on the message a speaker conveys. <u>Sorrell</u>,
> <u>supra</u>, at ----, 131 S.Ct., at 2664. Some facial
> distinctions based on a message are obvious, defining
> regulated speech by particular subject matter, and
> others are more subtle, defining regulated speech by
> its function or purpose. Both are distinctions drawn

7

> based on the message a speaker conveys, and,
> therefore, are subject to strict scrutiny.

135 S. Ct. at 2227. Additionally, the Supreme Court made clear that the first step in the analysis is to "determin[e] whether the law is content neutral on its face." Id. at 2228. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Id. (internal quotation marks omitted). Moreover, "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." Id. at 2230. In Reed, the Supreme Court also gave examples of aspects of signs that could be regulated in a content-neutral manner, including "size, building materials, lighting, moving parts, and portability." Id. at 2232.

With regard to the sign code exemptions at issue in Reed, the Supreme Court explained,

> The Town's Sign Code is content based on its face. It defines "Temporary Directional Signs" on the basis of whether a sign conveys the message of directing the public to church or some other "qualifying event." Glossary 25. It defines "Political Signs" on the basis of whether a sign's message is "designed to influence the outcome of an election." Id., at 24. And it defines "Ideological Signs" on the basis of whether a sign "communicat[es] a message or ideas" that do not fit within the Code's other categories. Id., at 23. It then subjects each of these categories to different restrictions.

The restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign. If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government.

135 S. Ct. at 2227.

In the Court's order granting TRO, the Court found that "[m]ultiple provisions of the Billboard Act are affected by the constitutional analysis set forth in Reed." (ECF No. 110 at 8.) These provisions included 1) the on-premise exemption codified in § 54-21-107(a)(1); 2) § 54-21-107(a)(2), which exempts from regulation signs that "advertis[e] the sale or lease of property on which they are located;" 3) § 54-21-103(1), which provides an exception for "[d]irectional or other official signs and notices including, but not limited to, signs and notices pertaining to natural wonders, scenic and historical attractions that are authorized or required by law;" and 4) §§ 54-21-103(2)-(3), which provide exceptions that mirror the content-based exemptions in §§ 107(a)(1)-(2). (ECF No. 110 at 8-9.)

Defendants argue that these provisions are not content-based. Defendants aver that the on-premise distinction is content neutral because "it is entirely based on location or

placement of the signs.  An on-premises sign is one that is on the premises of an establishment, whereas an off-premises sign does not have a premises as such. It is logical to distinguish between the two by reference to place."  (ECF No. 118 at 6.) Defendants further assert that the on-premise distinction survives Reed and is consistent with the Supreme Court's decision in Metro-Media, Inc. v. San Diego, 453 U.S. 490 (1981). (Id. at 6.)  Defendants also point to Justice Alito's concurring opinion in Reed in support of their argument for content-neutrality, which states explicitly that "[r]ules distinguishing between on-premises and off-premises signs" are not content based.  (Id. at 6-7.)

Notwithstanding Defendants' supplemental arguments, the rationale applied by the Court in the order granting TRO still applies: "[t]he only way to determine whether a sign is an on-premise sign, is to consider the content of the sign and determine whether that content is sufficiently related to the 'activities conducted on the property on which they are located.'"  (ECF No. 110 at 8 (quoting § 107(a)(1)).)  This conclusion is compelled by the face of the statute and is reinforced by the testimony given by Shawn Bible, head of the Beautification Office at TDOT, during the TRO motion hearing.[1] Bible described a two part test that her department used for

---

[1] During the preliminary injunction hearing, Defendants introduced transcripts from the TRO hearing as evidence.  (See ECF No. 126 at 1.)

determining whether a sign is an on-premise sign.  First, the sign "has to be on that property where the activity is taking place . . . ."  (ECF No. 121 at 15.)  Second, the sign "has to be advertising or speaking up for the things going on there at that premise."  (Id. at 15-16.)  Bible further explained that the messages on the signs "have to be attached to that activity," i.e., the activity taking place on the property.  (Id. at 16.)  Bible gave multiple examples of messages on signs that were sufficiently related to the activities on the property for her department to consider the signs on-premise signs.  (Id. at 16-18.)  Bible's testimony confirms that whether analyzing the on-premise exemption on its face or as applied in practice, the content or message of the sign must be considered to determine whether a sign is on-premise.

Additionally, Justice Alito's concurrence in Reed is inapposite to the instant analysis.  Not only is the concurrence not binding precedent, but the concurrence fails to provide any analytical background as to why an on-premise exemption would be content neutral.  The concurrence's unsupported conclusions ring hollow in light of the majority opinion's clear instruction that "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."  Reed, 135 S. Ct. at 2230.

The preceding analysis applies equally to the determination of whether a sign is directional; pertains to natural wonders or scenic and historical attractions; or advertises the sale or lease of property on which it is located. Accordingly, under the Reed test, §§ 54-21-107(a)(1)-(2), 54-21-103(1)-(3) of the Billboard Act are likely content-based.

## 2. Strict Scrutiny

Once the Court determines that provisions of the Billboard Act are content-based, the Court must apply strict scrutiny to determine whether those provisions pass constitutional muster. Content-based provisions will fail constitutional muster if the Government cannot demonstrate that the divergence in regulations based on the content of the signs "furthers a compelling governmental interest and is narrowly tailored to that end." Reed, 135 S. Ct. at 2231. A law regulating speech is not narrowly tailored if it is either underinclusive or overinclusive. See Reed, 135 S. Ct. at 2231-32; Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd., 502 U.S. 105, 121-23 (1991) (finding that a New York state law was not narrowly tailored due to its overinclusiveness).

In the instant case, Defendants assert that the Billboard Act serves the following governmental interests: 1) driver safety; 2) the public's investment in highways; 3) the promotion of recreational value of public travel and natural beauty; and

4) the continuation of adequate federal funding.  Defendants

argue that these interests "in combination constitute a

compelling State interest."  (ECF No. 118 at 12.)

Defendants also argue that the Billboard Act is narrowly

tailored because the government's interests are "achieved more

effectively with The Billboard Act."  (Id. at 11.)  Defendants

aver that the Billboard Act is not overinclusive because it does

not "discriminat[e] between any category of speech," and is not

underinclusive because the Billboard Act "restricts according to

location, not category while respecting the rights of property

owners to advertise their activities."  (Id. at 13.)  Defendants

aver that "without the [Billboard] Act, there would be a

significant proliferation of outdoor advertising."  (Id. at 11.)

Defendants assert that the "visual clutter [] would be a blight

on our highways and would block out the scenic beauty that has

been revealed and protected during the 40+ years that The

Billboard Act has been in effect."  (Id.)  Additionally,

Defendants assert that "[t]he unregulated proliferation of

outdoor advertising would also be dangerously distracting

and . . . visually blinding, for ordinary drivers traveling at

high speeds on State and interstate highways."  (Id.)

In light of the explicit analysis in Reed that addresses

some of the same interests and issues raised in the instant

case, the Court is compelled to reject Defendants' arguments

that the content-based provisions of the Billboard Act survive
strict scrutiny. The Court agrees with Defendants that at least
the governmental interest in driver safety is a compelling
interest. Defendants arguments that the Billboard Act is
narrowly tailored, however, miss the mark. Without determining
whether the stated governmental interests were compelling
interests, the Supreme Court found the sign code provisions at
issue in Reed to be "hopelessly underinclusive." 135 S. Ct. at
2231. With regard to the governmental interest in traffic
safety, the Supreme Court explained that the respondents had
failed to "show[] that limiting temporary directional signs is
necessary to eliminate threats to traffic safety, but that
limiting other types of signs is not." Id. at 2232. As to the
governmental interest in preservation of aesthetics, the Supreme
Court stated that "temporary directional signs are 'no greater
an eyesore' . . . than ideological or political ones." Id. at
2231 (internal citations omitted).

The issue of underinclusiveness in the instant case does
not relate to whether the location restrictions are narrowly
tailored, but rather, whether the differentiation between signs
of varying content "furthers a compelling governmental interest
and is narrowly tailored to that end." See id. Consequently,
Defendants' argument that the Billboard Act "restricts according
to location, not category while respecting the rights of

14

property owners to advertise their activities" is inapposite to the instant analysis.

Similar to the petitioners in Reed, Defendants have failed to establish that limiting off-premise signs results in greater driver safety than limiting signs "advertising activities conducted on the property on which they are located." See § 107(a)(1). Nor have Defendants shown that imposing more stringent restrictions on off-premise signage affords superior protection of the public's investment in the highways or increases the promotion of recreational value of public travel and natural beauty. The same reasoning applies to preferential treatment of directional signs, signs advertising the sale or lease of property on which they are located, and signs pertaining to natural wonders and scenic and historical attractions.

Additionally, concerns raised by Defendants that visual clutter and overcrowding of signs will adversely affect the stated governmental interests only bear on the present analysis if Defendants can show that regulation of one type of content will reduce overcrowding more effectively than regulation of other types of content. Defendants have not made this showing. Simply, Defendants have not established that differentiation of content would have any effect on the first three stated

governmental interests.  Accordingly, the Billboard Act, like the ordinance provisions in <u>Reed</u>, is hopelessly underinclusive.

With regard to the fourth governmental interest—to continue adequate federal funding—Defendants aver that TDOT could lose federal funding if the Billboard Act is found to be unconstitutional.  (ECF No. 118 at 11.)  During the TRO hearing, Bible testified that failure to "have a billboard law and effectively control outdoor advertising" would result in a ten percent reduction of the federal transportation funds.  (ECF No. 121 at 29.)  For this reason, Defendants assert, "the Billboard Act tracks the Federal Highway Beautification Act almost to the letter."  (ECF No. 118 at 13.)  In further support of this argument, Defendants have submitted an email that Shawn Bible received from an employee of the Federal Highway Administration ("FHWA").  (ECF No. 127.)  The email states in relevant part that "the Supreme Court did not rule on the constitutionality of the HBA but rather on a city ordinance that controlled signs within the small town of Gilbert; therefore, we still have a valid federal law that the States are supposed to enforce as a condition of receiving all their Federal-aid highway funding." (<u>Id.</u> at 3.)

Although the submitted email shows that at this point in time the FHWA intends to enforce the Highway Beautification Act against the States, Defendants fail to provide adequate

explanation as to how the federal government would be able to constitutionally withhold federal highway funds from a state on the basis that the state failed to engage in conduct that violates the United States Constitution. Consequently, the fourth governmental interest is not relevant to the issues presently before the Court, nor is it a compelling interest for the purposes of a strict scrutiny analysis.

For these reasons, there is a strong likelihood that at least §§ 54-21-103(1)-(3) and §§ 54-21-107(a)(1)-(2) of the Billboard Act are unconstitutional.

### 3. Severability

Typically, when a portion of a state law is found to be unconstitutional, the Court will sever that portion from the remaining constitutional portions of the law. <u>Ayotte v. Planned Parenthood of N. New England</u>, 546 U.S. 320, 328-29 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force . . . or to sever its problematic portions while leaving the remainder intact . . . ."). In determining severability, "[f]irst, the Court seeks to avoid 'nullify[ing] more of a legislature's work than is necessary,' because doing so 'frustrates the intent of the elected representatives of the

people.'  For this reason where partial, rather than facial,

invalidation is possible, it is the 'required course.'"

Northland Family Planning Clinic, Inc. v. Cox, 487 F.3d 323, 333

(6th Cir. 2007) (quoting Ayotte, 546 U.S. at 329).  Second,

"mindful that [the Court's] constitutional mandate and

institutional competence are limited, [the Court] restrain[s]

[itself] from rewriting state law to conform it to

constitutional requirements even as [the Court] strive[s] to

salvage it."  Ayotte, 546 U.S. at 329 (internal alteration and

quotation marks omitted).  "[W]here the Court has established a

bright line constitutional rule, it is more appropriate to

invalidate parts of the statute that go beyond the

constitutional line, whereas 'making distinctions in a murky

constitutional context, or where line-drawing is inherently

complex, may call for a "far more serious invasion of the

legislative domain" than we ought to undertake.'"  Northland

Family Planning Clinic, 487 F.3d at 333 (quoting Ayotte, 546

U.S. at 330).  "Finally, the Court considers legislative intent,

and inquires whether the legislature would prefer to have part

of the statute remain in force."  Id.  "A court's conclusion

that the legislature would have enacted a statute absent an

unconstitutional provision must be based on evidence that is

obvious on the 'face of the statute' . . . ; otherwise the court

risks overstepping into functions reserved for the legislature."

E. Brooks Books, Inc. v. City of Memphis, 633 F.3d 459, 466 (6th Cir. 2011) (quoting Memphis Planned Parenthood, Inc. v. Sundquist, 175 F.3d 456, 466 (6th Cir. 1999)).

In the instant case, the third factor controls. Under Tennessee law, severance of unconstitutional portions of a statute is generally disfavored. Davidson Cnty. v. Elrod, 232 S.W.2d 1, 2-3 (Tenn. 1950); see also E. Brooks Books, 633 F.3d at 466. "Tennessee law permits severance only when 'it is made to appear from the face of the statute that the legislature would have enacted it with the objectionable features omitted.'" Memphis Planned Parenthood, 175 F.3d at 466 (quoting State v. Harmon, 882 S.W.2d 352, 355 (Tenn. 1994)). It follows then, that the question in the instant case is whether it appears on the face of the Billboard Act that the Tennessee General Assembly would have passed the statute without the content-based provisions in the Billboard Act. See id.

In the instant case, Thomas has shown a strong likelihood that § 54-21-103(1) and §§ 54-21-107(a)(1)-(2) are unconstitutional under the Reed test. See supra Part III.A.1-2. Section 103 of the Billboard Act establishes general restrictions of and exceptions to the Act. Section 107 sets out advertising that is exempt from regulation under the Billboard Act. These sections guide the fundamental determination of which signs are subject to regulation under the Billboard Act.

19

The remaining sections of the Billboard Act deal with the minutiae of executing the Act, rather than determining substantive compliance, and are generally dependent on sections 107 and 103. For example, § 54-21-104 provides guidelines for issuing licenses and permits based on compliance with § 103 and assuming § 107 does not apply. Section 105 addresses the remedies and consequences of failing to comply with § 103. Section 106 deals with the handling of fees collected in connection with permitting under § 104. Section 108 outlines the commissioner's authority to acquire certain outdoor advertising. These sections lie on the periphery of § 103 and § 107, which establish the regulatory base for all signs erected "within six hundred sixty feet (660') of the nearest edge of the right-of-way and visible from the main traveled way of the interstate or primary highway systems" in the State of Tennessee. Given the various competing interests and constitutional constraints on the regulation of this type of speech, it is not clear on the face of the statute that the Tennessee legislature would have enacted the Billboard Act absent these key provisions establishing the overall applicability of the statute.

The same reasoning applies to the first and second factors for determining severability. Removing the basic guidelines for determining whether a sign is regulated under the Act, oversteps

the line between preserving the "legislature's work" and "rewriting state law to conform it to constitutional requirements."  See <u>Northland Family Planning Clinic</u>, 487 F.3d at 333.  Under these circumstances, partial invalidation is not possible.  See <u>id.</u>  Accordingly, there is a strong likelihood that the unconstitutional provisions of the Billboard Act are not severable from the Act as a whole.

For these reasons, Thomas has established a strong likelihood that the Billboard Act is an unconstitutional restraint on freedom of speech pursuant to the First Amendment.

**B.    Irreparable Injury**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976).  In the instant case, "Defendants concede that, if Plaintiff is correct, and the Crossroads Ford billboard, in its current format as non-commercial message, is entitled to First Amendment protections, then there would potentially be irreparable harm if said billboard is removed."  (ECF No. 118 at 16.)  Because Thomas has established a strong likelihood that removal of the Crossroads Ford sign pursuant to the Billboard Act is unconstitutional, the Court finds that Thomas would suffer irreparable injury absent issuance of a preliminary injunction.

**C.   Substantial Harm to Others**

With regard to substantial harm to others, Defendants argue that "there is a real threat to the safety and aesthetics of the highways, plus significant loss of federal funding." (ECF No. 118 at 17.) Additionally, Defendants assert that "the public in general has an interest in stability in the laws and in seeing that the laws of the State are properly followed." (Id.) Thomas contends that "[t]he government cannot allege that it will be harmed by allowing citizens and organizations to exercise their free speech rights without constraint of unconstitutional sign restrictions." (ECF No. 96 at 36.)

The Court agrees with Thomas. The harm to Thomas' First Amendment rights "should the preliminary injunction not be issued must be weighed against the harm to others from the granting of the injunction." See United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 363 (6th Cir. 1998). In the instant case, Thomas has established a strong likelihood that the Billboard Act is unconstitutional and that he would suffer irreparable harm should TDOT act against Thomas pursuant to the Act.

In contrast, the potential harm to others is relatively slight. A preliminary injunction merely "preserve[s] the relative positions of the parties," and "findings of fact and conclusions of law made by a court granting a preliminary

injunction are not binding at trial on the merits . . . ."
Camenisch, 451 U.S. at 395 (internal citations omitted).
Moreover, the scope of the instant Order is limited to the
Crossroads Ford sign and its related proceedings.  Consequently,
TDOT will not be prohibited from enforcing the Billboard Act as
to other signs.

Even if this Order had the effect of declaring the entire
Billboard Act unconstitutional, the potential harm to Thomas
would outweigh the concerns raised by Defendants.  All of the
concerns raised by Defendants—threat to safety, threat to
aesthetics, and loss of federal funding—are consequences that
arise from the unconstitutionality of the Billboard Act, not the
issuance of injunctive relief.  Because the scope of the
injunction is limited to the Crossroads Ford sign, only
individuals that view or are in some other way affected by the
Crossroads Ford sign could suffer harm as a result of issuance
of an injunction.  Harm to public safety and aesthetics is,
therefore, of limited significance in the present analysis.
Accordingly, this factor does not weigh in Defendants' favor.

### D.  Public Interest

"[I]t is always in the public interest to prevent violation
of a party's constitutional rights."  Deja Vu of Nashville, Inc.
v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 274 F.3d
377, 400 (6th Cir. 2001) (internal quotation marks omitted).

23

Because Thomas has established a strong likelihood that removal of the Crossroads Ford sign pursuant to the Billboard Act is unconstitutional, the public interest also favors issuance of a TRO.

**E.   Balance of the Factors**

Having considered the relevant preliminary injunction factors, the Court finds that they weigh in favor of issuance of a preliminary injunction.

**E.   Anti-Injunction Act**

In Defendants' response in opposition to Thomas' motion for emergency temporary restraining order, Defendants allude to the Anti-Injunction Act, 28 U.S.C. § 2283, as being applicable to the relief sought in Thomas' motion. Specifically, Defendants assert that Thomas seeks to nullify the Tennessee Court of Appeals' ruling in favor of Defendants and that "it would violate principles of federalism" to reverse the Court of Appeals' ruling. (ECF No. 99 at 3-4.)

The Court's analysis regarding the Anti-Injunction Act in the order granting TRO applies equally to the instant order. Although in most cases it would be inappropriate for a federal district court to enjoin state court proceedings, the Supreme Court has held explicitly that "§ 1983 is an Act of Congress that falls within the 'expressly authorized' exception of [the Anti-Injunction Act]." Mitchum v. Foster, 407 U.S. 225, 243

(1972).  Accordingly, the relief sought by Thomas does not exceed the limits of authority granted to federal courts.

## IV. CONCLUSION

For the reasons stated above, the Court converts the existing temporary restraining order into a preliminary injunction.  The Court hereby ENJOINS Defendants, or any of their employees, subordinates, agents or others acting on their behalf, from 1) removing or seeking by order or other means to remove Thomas' sign at the Crossroads Ford location; and 2) from seeking to execute on any judgments, orders, or other monetary judgments resulting or associated with the Crossroads Ford billboard sign until such time as the Court determines that the preliminary injunction should be lifted.

**IT IS SO ORDERED**, this 8th day of September, 2015.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE