**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| WILLIAM H. THOMAS, JR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13-cv-02987-JPM-cgc |
| v. | ) | |
| | ) | |
| JOHN SCHROER, Commissioner of the | ) | |
| Tennessee Department of Transportation in | ) | |
| his official capacity, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER & MEMORANDUM FINDING BILLBOARD ACT AN UNCONSTITUTIONAL, CONTENT-BASED REGULATION OF SPEECH

This action concerns alleged First Amendment violations that occurred when agents of the State of Tennessee ("the State") sought to remove Plaintiff William H. Thomas's non-commercial billboard pursuant to the Billboard Regulation and Control Act of 1972 ("Billboard Act"), Tennessee Code Annotated §§ 54-21-101, *et seq.* For the reasons stated below, the Court finds the Billboard Act is an unconstitutional, content-based regulation of speech. United States Supreme Court authority compels this conclusion.

There exists an undeniable trend in Supreme Court cases to guard against regulations that selectively ban speech on the basis of its subject matter—e.g., content-based regulations. Police Department of Chicago v. Mosley, 408 U.S. 93 (1972). Distilling a pragmatic and constitutionally-valid definition for content-based regulations has evolved overtime. In the late 1980s, the Supreme Court looked to the governing body's intent to determine whether a regulation constituted a content-based regulation. Ward v. Rock Against Racism, 491 U.S.

781 (1989); <u>City of Renton v. Playtime Theaters, Inc.</u>, 475 U.S. 41 (1986).  In <u>Reed v. Town of Gilbert</u>, 135 S. Ct. 2218 (2015), however, the Supreme Court revisited its previous approach.  Writing for the Court in <u>Reed</u>, Justice Thomas explained, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus' toward the ideas contained in the regulated speech."  <u>Id.</u> at 2222.[1]  That content-based inquiry has now been further advanced by the Supreme Court's decision in <u>Expressions Hair Design v. Schneiderman</u>, No. 15-1391, 2017 WL 1155913, at *1 (U.S. Mar. 29, 2017), in which the Court remanded a case concerning a regulation that banned some forms of commercial speech for further examination to determine whether the regulation survives First Amendment scrutiny.

In the instant case, the regulation at issue – the Tennessee Billboard Regulation and Control Act of 1972, Tennessee Code Annotated §§ 54-21-101, *et seq*. – regulates both commercial and non-commercial speech by banning some forms of both on the basis of content and therefore does not survive First Amendment scrutiny.

---

[1] Since <u>Reed</u>, which invalidated a municipal code that imposed different restrictions on outdoor signs based on the signs' message, courts have found regulations to be content based if the regulation targets or limits anyone seeking to engage in a specific type of speech. <u>See, e.g.</u>, <u>Champion v. Commonwealth</u>, No. 2015-SC-000570-DG, 2017 WL 636420, at *3 (Ky. Feb. 16, 2017); <u>Microsoft Corp. v. United States Dep't of Justice</u>, No. C16-0538JLR, 2017 WL 530353, at *12 (W.D. Wash. Feb. 8, 2017); <u>Brickman v. Facebook, Inc.</u>, No. 16-CV-00751-TEH, 2017 WL 386238, at *5 (N.D. Cal. Jan. 27, 2017); <u>Sweet Sage Café, LLC v. Town of N. Redington Beach, Florida</u>, No. 8:15-CV-2576-T-30JSS, 2017 WL 385756, at *9 (M.D. Fla. Jan. 27, 2017); <u>Indiana Civil Liberties Union Found.. Inc. v. Indiana Sec'y of State</u>, No. 115CV01356SEBDML, 2017 WL 264538, at *4 (S.D. Ind. Jan. 19, 2017); <u>Wagner v. City of Garfield Heights</u>, No. 13-3474, 2017 WL 129034, at *6 (6th Cir. Jan. 13, 2017); <u>Auspro Enterprises, LP v. Texas Dep't of Transportation</u>, 506 S.W.3d 688, 700 (Tex. App. 2016) (finding Texas Highway Beautification Act regulations content based and unconstitutional); <u>Thayer v. City of Worcester</u>, 144 F. Supp. 3d 218, 233 (D. Mass. 2015); <u>Browne v. City of Grand Junction</u>, 136 F.Supp.3d 1276, Civ.Act.No. 14–cv–00809–CMA–KLM, 2015 WL 5728755 (D.Col. Sep. 30, 2015); <u>Norton v. City of Springfield</u>, 2015 WL 4714073 (7th Cir. 2015).  Legislatures have also sought to amend regulations to withstand <u>Reed</u>'s holding.  <u>See, e.g.</u>, <u>Geft Outdoor LLC v. Consol. City of Indianapolis & Cty. of Marion, Indiana</u>, 187 F. Supp. 3d 1002, 1016 (S.D. Ind. 2016).

## I. BACKGROUND

The Tennessee Department of Transportation ("TDOT") promulgates and enforces billboards and outdoor advertising signs under Tennessee's Billboard Regulation and Control Act of 1972, (the "Billboard Act"). (ECF No. 45 ¶ 13.) The State of Tennessee and TDOT also regulate billboards and outdoor advertising signs under to the Federal Highway Beautification Act of 1965, as amended. (Id. ¶ 14.)

The Federal Highway Beautification Act and the Billboard Act are designed to control the erection and maintenance of billboards and signs along the National Highway System. (See Exs. B, C, Bible Aff., ECF No. 166-2; SUF ¶ 33; Resp. to SUF ¶ 33.)) Regulated billboards and signs under the Billboard Act are subject to location and/or permit and tag restrictions, e.g., they may not be "within six hundred sixty feet (660′) of the nearest edge of the right-of-way and visible from the main traveled way of the interstate or primary highway systems . . . without first obtaining from the commissioner a permit and tag." T. C. A. § 54-21-104(a). Some signs, however, may be exempted or qualify as exceptions under the Billboard Act's location and/or permit and tag restrictions. See T.C.A. §§ 54-21-103(1)-(3) and §§ 54-21-107(a)(1)-(2). For example, a billboard or sign is exempted from the six-hundred-sixty feet requirement if it qualifies as one of the following types of signs:

> (2) Signs, displays and devices advertising the sale or lease of property on which they are located;
>
> (3) Signs, displays and devices advertising activities conducted on the property on which they are located;
>
> . . . .

T.C.A. §§ 54-21-103(1)-(3). A billboard or sign is exempted from complying with the permit and tag restrictions if it falls into one of the following categories:

3

(1) Those [signs] advertising activities conducted on the property on which they are located;

(2) Those [signs] advertising the sale or lease of property on which they are located; and

. . . .

T.C.A. §§ 54-21-107(a)(1)-(2).

In practice, State agents label signs the Billboard Act regulates as "off-premise" signs and label unregulated signs as "on-premise" signs. (See ECF No. 64 at PageID 917.) The State's agents use the following Rule to make their determinations:

> A sign will be considered to be an on-premise sign if it meets the following requirements.
>
> > (a) Premise – The sign must be located on the same premises as the activity or property advertised.
> >
> > (b) Purpose – The sign must have as its purpose (1) the identification of the activity, or its products or services, or (2) the sale or lease of the property on which the sign is located, rather than the purpose of general advertising.

(ECF No. 46-6 at PageIDs 718-19 (quoting Rule 1680-02-03-.06(2); see also ECF No. 121 at 15-16.) Rule 1680-02-03-.06 further expands on the 'Purpose Test'

> [t]he following criteria shall be used for determining whether a sign has as its purpose (1) the identification of the activity located on the premises or tis products or services, or (2) the sale or lease of the property on which the sign is located rather than the business of outdoor advertising.
>
> > (a) General
> >
> > > 1. Any sign which consists solely of the name of the establishment is an on-premise sign.
> > > 2. A sign which identifies the establishment's principle or accessory product or services offered on the premises is an on-premise sign.
> > > 3. An example of an accessory product would be a brand of tires offered for sale at a service station.

(b) Business of Outdoor Advertising

    1. When an outdoor advertising device (1) brings rental income to the property owner, or (2) consists principally of brand name or trade name advertising, or (3) the product or service advertised is only incidental to the principle activity, it shall be considered the business of outdoor advertising and not an on-premise sign. An example would be a typical billboard located on the top of a service station building that advertised a brand of cigarettes or chewing gum which is incidentally sold in a vending machine on the property.

    2. An outdoor advertising device which advertises activities conducted on the premises, but which also advertises, in a prominent manner, activities not conducted on the premises, is not an on-premise sign. An example would be a sign advertising a motel or restaurant not located on the premises with a notation or attachment stating "Skeet Range Here," or "Dog Kennels Here." The on-premise activity would only be the skeet range or dog kennels.

(c) Sale or Lease Signs

    A sale or lease sign which also advertises any product or service not located upon and related to the business of selling or leasing the land on which the sign is located is not an on-premise sign. An example of this would be a typical billboard which states "THIS PROPERTY FOR SALE- SMITHS MOTEL; 500 ROOMS, AIR CONDITIONED, TURN RIGHT 3 BLOCKS AT MA IN STREET."

Rule of Tennessee Department of Transportation Maintenance Division, Control of Outdoor Advertising, 1680-02-03.06(4) (2008). Although the Billboard Act and the State's Rule reference "advertising" in the commercial context, the State contends the Billboard Act's regulations, exceptions, and exemptions apply with equal force to commercial and non-commercial messages. (See ECF No. 64 at PageID 917.)

Plaintiff Thomas's business involves posting outdoor advertising signs. (ECF Nos. 1 ¶ 11; 45 ¶ 11.) Thomas erects these signs on the various tracts of real property he owns throughout Tennessee. (ECF No. 45 ¶ 10.) Thomas's sign at issue in this case is located off Interstate-40 West in Memphis, Tennessee (hereinafter the "Crossroads Ford sign"). (Id. ¶

21.)  Thomas has posted various messages on this sign over the years.  (Id.)  For example, in 2012, he displayed an image of an American flag with Olympic rings, in support of that year's U.S. Olympic team.  (ECF No. 38 ¶ 23.)  Later that year, in the "beginning of fall," he "displayed content referencing the upcoming holiday season with a picture of an American Flag."  (ECF No. 45 ¶ 24.)  Thomas erected his Crossroads Ford sign without a permit.  (ECF No. 46-6 at PageID 721 (citing Tennessee v. Thomas, 336 S.W.3d 588, 593 (Tenn. Ct. App. 2010).)

Since approximately 2006, the State has sought to remove Thomas's signs that did not comply with the Billboard Act—including the Crossroads Ford sign—through an ongoing enforcement action in Chancery Court in Shelby County, Tennessee.  (ECF Nos. 1 ¶¶ 62, 77; 45 ¶ 27; see ECF Nos. 96–1 at PageID 1399–1404; 46-2 – 46-5; see also Tennessee v. Thomas, 336 S.W.3d 588, 593 (Tenn. Ct. App. 2010).)  In 2006, TDOT denied Thomas's permit and building application for his Crossroads Ford sign because it was less than 1,000 feet from a competitor's billboard.  (ECF No. 166-1 at PageID 2595 (citing Thomas v. TDOT, 336 S.W.3d 588, 592 (Tenn. Ct. App. 2010).)  Nonetheless, Thomas began construction on his Crossroads Ford sign in 2007, and TDOT then brought an enforcement action in March 2007. (Id.)  In April and October of 2011, the State removed two of Thomas's outdoor advertising signs (the "Kate Bond" signs).  (ECF No. 45 ¶¶ 33, 37; ECF No. 79 ¶¶ 33, 37.)  Throughout 2012 and 2013, Thomas defended his signs in administrative proceedings before the Commissioner of TDOT.  (See ECF Nos. 263-18—263-20.)

On March 25, 2013, Thomas filed an initial Complaint and Request for Declaratory Judgment.  (Thomas v. Tennessee Department of Transportation, No. 2:13-cv-2185-JPM-cgc (W.D. Tenn. 2013), ECF No. 1.)  Thomas sought relief under 28 U.S.C. § 1983 for violations

of his First and Fourteenth Amendment rights under the United States Constitution. (Id. ¶ 3.) The Complaint also alleged Thomas's Crossroads Ford sign was entitled to First Amendment protection as a display of non-commercial speech. (Id. ¶ 39.) On July 24, 2013, TDOT filed a Motion to Dismiss the Complaint, alleging TDOT is immune from suit and that Thomas's claims fail to state a claim. (ECF No. 18.) Thomas sought to avoid TDOT's Rule 12(b)(1) and 12(b)(6) defenses by requesting leave to file an Amended Complaint adding individual defendants. (See ECF No. 26.) On October 28, 2013, the Court dismissed Thomas's claims, based on TDOT's Eleventh Amendment immunity. (ECF No. 31 at PageID 180.) Thomas appealed (ECF No. 33), and on August 6, 2014, the Sixth Circuit Court of Appeals affirmed, holding that had Thomas named a state official in his or her official capacity, his claims would have survived dismissal (ECF No. 35 at PageID 204).

On December 17, 2013, while this first action was on appeal, Thomas filed his Complaint in this action, which named multiple Tennessee state officials in their official capacities. (Thomas v. Schorer et al, No. 13-2987 (W.D. Tenn.), ECF No. 1.) The Complaint alleged Thomas's Crossroads Ford sign was entitled to First Amendment protection as a display of non-commercial speech. (Id. ¶ 52.) Thomas filed an Amended Complaint on October 27, 2014. (See ECF Nos. 22, 34, 38, 45.) Thomas's Amended Complaint also argued that "in March of 2014, TDOT, through Commissioner Schroer, filed an action against Mr. Thomas in the Twentieth Judicial District Chancery Court for the State of Tennessee in retaliation for Mr. Thomas exercising his rights to petition this Court for redress of his grievances against Defendants." (ECF No. 45 ¶ 65.)

Thomas' initial fillings also included additional claims against the State: First Amendment, Retaliation, Equal Protection and Declaratory Judgment. (ECF Nos. 1, 45.)

Following the Court's Order on the State's motion to dismiss, (ECF No. 170), and summary judgment (ECF No. 233), Thomas's only remaining claim is whether the removal of his billboards under the Billboard Act violated his First Amendment rights. This Order concerns only this issue.

In October 2014, the State removed another of Thomas's outdoor signs (the "Perkins Road sign"), even though, according to Thomas, "[the] billboard was displaying exclusively on-premise, noncommercial content and therefore exempt from the permitting requirements of T.C.A. § 54–21–107(a)(1)." (ECF No. 45 ¶ 40; ECF No. 79 ¶ 40.)

On May 26, 2015, TDOT sent Thomas a letter stating that Thomas must remove the Crossroads Ford sign by June 26, 2015. (ECF No. 96–1 at PageID 1399.) Thomas also received a proposed order of judgment "declaring an unlawful billboard to be [a] public nuisance and granting permanent injunction for removal of the unlawful billboard," to be subsequently submitted in Chancery Court in Shelby County, Tennessee. (Id. at PageID 1401–03.)

On June 10, 2015, Plaintiff filed an Emergency Motion for Temporary Restraining Order ("TRO") to prevent Defendants from removing his Crossroads Ford sign. (ECF No. 96.) He also sought to enjoin Defendants from executing any judgments "resulting [from] or associated with the Crossroads Ford billboard sign until such time as a hearing can be held on the issues . . . ." (Id. at 1.) On June 11, 2015, Defendant opposed the TRO. (ECF No. 99.) On June 18, 2015, the Court held a Motion Hearing on TRO motion. (ECF No. 104.)

On June 24, 2015, the Court granted Thomas's TRO motion and ordered the State to "refrain from seeking to execute on any judgments, orders, or other monetary judgments

resulting from or associated with the Crossroads Ford billboard sign until such time as the Court deems it appropriate to lift the TRO." (ECF No. 110 at PageID 1464.) The Court found "a strong likelihood that multiple sections of the Billboard Act are facially content-based and subject to strict scrutiny under" Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015). (Id. at PageID 1455.) The Court also found "a strong likelihood that at least §§ 54-21-103(1)-(3) and §§ 54-21-107(a)(1)-(2) of the Billboard Act are unconstitutional." (Id. at PageID 1456.) On September 8, 2015, the Court granted a preliminary injunction. (ECF No. 163.)

The Court entered an Amended Scheduling Order on May 31, 2016 (ECF Nos. 170, 233) to reflect the narrowing of issues, and set a jury trial for September 12, 2016. (ECF No. 237.) The parties filed timely pretrial motions. (See ECF Nos. 280-86.)

On September 6, 2016, the Court entered an Order Regarding Defendants' Motion in Limine as to Money Damages (ECF No. 280). (ECF No. 301.) The Court stated that the jury would decide two issues: "(1) whether the State has a compelling interest that is furthered by the Billboard Regulation and Control Act of 1972 ("Billboard Act"), as set forth at Tennessee Code Annotated §§ 54-21-101 to -123 (2008); and (2) whether the Billboard Act is narrowly tailored to the State's interest." (Id. at PageID 5964.) The jury would not decide the ultimate constitutionality question. (Id.) The jury trial was then rescheduled to September 19, 2016. (Min. Entry, ECF No. 305.)

On September 9, 2016, Thomas filed a Written Objection to Allowing the Jury to Decide the Issues of "Compelling State Interest" and "Narrow Tailoring." (ECF No. 307.) On September 16, 2016, the Court entered an Order Concerning Plaintiff's Objection to the

Jury Determining "Compelling Interest" and "Narrow Tailoring." (ECF No. 314.) The Court clarified the jury would serve as an advisory jury on the issues before them. (Id. at PageIDs 6140, 6146.)

A four-day, advisory-jury trial began on September 19, 2016. (Min. Entries, ECF Nos. 320-21, 322, 328.) Seven witnesses testified on behalf of the State: Paul Degges, Chief Engineer for TDOT; John Schroer, Commissioner of TDOT; Robert Shelby, retiree from the Highway Beautification Department at TDOT; John Carr, Assistant Commissioner of Administration at TDOT; Colonel Tracy Trott, highway patrol law enforcement officer; Jason Moody, Assistant Regional Traffic Engineer at TDOT; and Shawn Bible, Beautification Coordinator at TDOT. (See ECF No. 331.) On September 22, 2016, a jury found the State had a compelling interest, and that the Billboard Act was narrowly tailored to that interest. (ECF No. 329.) On the same day, Thomas filed a Rule 52 Motion for Verdict as a Matter of Law. (ECF No. 325.) The State responded in opposition on October 7, 2016. (ECF No. 336.) Thomas replied on October 21, 2016. (ECF No. 340.)

On October 26, 2016, the Court entered an Order Concerning Least Restrictive Means, ordering the parties to file supplemental briefing on the issue of least restrictive means. (ECF No. 342.) Both parties timely briefed the issue. (ECF Nos. 343-44.)

On November 23, 2016, Amici Curiae National League of Cities, International Municipal Lawyers Association, Tennessee Municipal Attorneys Association, International City/County Management Association, Scenic America, Inc., Scenic Tennessee, Inc., Tennessee Conservation Voters, League of Women Voters of Knoxville/Knox County, Trees Knoxville, Keep Knoxville Beautiful, City of Knoxville, Tennessee Chapter of the American

10

Planning Association, and Tennessee Federation of Garden Clubs, Inc. (collectively,

"Movants")'s filed a Motion for Leave to File the Brief of Amici Curiae.  (ECF No. 346.)  On

November 30, 2016, Thomas opposed.  (ECF No. 347.)  Because the amicus brief sought to

address standing and the differentiation between on- and off-premises signs, both of which the

parties did not adequately brief, the Court granted the Motion for Leave to File the Brief of

Amici Curiae (ECF No. 346) on December 7, 2016.  (ECF No. 348.)  The Court granted in

part Thomas's request to respond to the standing issue, which Thomas timely briefed.  (ECF

Nos. 352, 354.)[2]

## II.     LEGAL STANDARD

### A.     Federal Rule of Civil Procedure 52

Federal Rule of Civil Procedure 52 provides,

> [i]n an action tried . . . with an advisory jury, the court must find the facts
> specially and state its conclusions of law separately.  The findings and
> conclusions may be stated on the record after the close of the evidence or may
> appear in an opinion or a memorandum of decision filed by the court.

Fed.R.Civ.P. 52(a)(1).   In the instant case, the Court makes its findings of fact and

conclusions of law following the advisory jury's verdict below.

---

[2] The Amicus Brief challenges Thomas's standing by claiming his First Amendment claim is time-barred.  Even if Thomas's First Amendment claim is time-barred, it would be "grossly unfair to allow [Thomas] to go to the expense of trying a case only to be met by a new defense after trial" that has not been raised by the State and lacks evidentiary development.  Bradford–White Corp. v. Ernst & Whinney, 872 F.2d 1153 (3d Cir. 1989) (holding that defendant waived statute of limitations defense when it raised issue in the answer but failed to attempt to establish this affirmative defense before or at trial), cert. denied, 493 U.S. 993 (1989).  Thus, the Court declines to grant *sua sponte* summary judgment in favor of the State.  See Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 407 (6th Cir. 1999).

**B.  First Amendment Protection: Commercial Versus Non-Commercial Speech**

The First Amendment mandates that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  This language generally prohibits any laws that regulate or restrict expression based on content: "[A]bove all else, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  Police Dep't v. Mosley, 408 U.S. 92, 95 (1972).

Not all speech is equally protected.  "[T]he degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech."  Bolger v. Youngs Drug Prod. Corp., 463 U.S. 60, 65 (1983).  The government may impose stricter regulations on commercial speech than on non-commercial speech.  See Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 513 (1981); Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557 (1980).  A statement is commercial speech when (1) it is an advertisement; (2) it refers to a specific product or service; and (3) the speaker has an economic motivation for making it.  Bolger, 463 U.S. at 66–67 ("The combination of all these characteristics . . . provides strong support . . . that the [speech at issue is] properly characterized as commercial speech.").  Non-commercial speech, on the other hand, involves ideological, political, religious, artistic, or scientific speech. National Endowment for the Arts v. Finley, 524 U.S. 569, 601 (1998).

**C.  Content-Based Restrictions**

In 2015, the Supreme Court held that "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state

interests." <u>Reed v. Town of Gilbert, Ariz.</u>, 135 S. Ct. 2218, 2226 (2015).  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." <u>Reed</u>, 135 S. Ct. at 2227.  Content–based regulations are those that "cannot be 'justified without reference to the content of the regulated speech'" and those that were "adopted by the government 'because of disagreement with the message [the speech] conveys.'" <u>Id.</u> (alteration in original) (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)).  "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." <u>Id.</u> at 2230.  Signs that could be regulated in a content-neutral manner include "size, building materials, lighting, moving parts, and portability." <u>Id.</u> at 2232.

The ordinance invalidated in <u>Reed</u> distinguished "temporary directional signs, political signs, and ideological signs." <u>Id.</u>  Courts have thus narrowed <u>Reed</u>'s applicability to non-commercial rather than commercial speech regulations.[3]  In short, a court strictly scrutinizes content-based restrictions of non-commercial speech, but "regulations on commercial speech [whether] content-based or content-neutral, [would be subject to] intermediate scrutiny. . . ." <u>PHN Motors, LLC v. Medina Twp.</u>, 498 F. App'x 540, 544 (6th Cir. 2012) (unpublished opinion); <u>see also</u> <u>Lone Star Security & Video, Inc. v. City of L.A.</u>, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016).   Some regulations, however, implicate both commercial and non-commercial speech.

---

[3] <u>See, e.g.</u>, <u>CTIA–The Wireless Ass'n v.City of Berkeley</u>, 139 F.Supp.3d 1048, 1061 (N.D. Cal. 2015) ("The Supreme Court has clearly made a distinction between commercial speech and noncommercial speech, . . . and nothing in its recent opinions, including <u>Reed</u>, even comes close to suggesting that that well-established distinction is no longer valid."); <u>Lone Star Sec. & Video, Inc. v. City of Los Angeles</u>, 827 F.3d 1192, 1198 n. 3 (9th Cir.2016); <u>RCP Publ'ns Inc. v. City of Chicago</u>, No. 15 C 11398, 2016 WL 4593830, at *4 (N.D.Ill. Sept. 2, 2016).  The Second Circuit has done the same in a summary order.  <u>Poughkeepsie Supermarket Corp. v. Dutchess Cty.</u>, 648 Fed.Appx. 156, 157 (2d Cir. 2016); <u>Timilsina v. West Valley City</u>, No. 2:14-cv-00046-DN-EJF, 2015 WL 4635453, at *7 (D. Utah Aug. 3, 2015).

When a content-based regulation affects both commercial and non-commercial speech, the speech's nature determines the appropriate level of scrutiny.  PHN Motors, 498 F. App'x at 543–44 (applying intermediate scrutiny because speech at issue was commercial); cf. Southlake Prop. Associates, Ltd. v. City of Morrow, Ga., 112 F.3d 1114, 1116–17 (11th Cir. 1997) ("To the extent that the ordinance regulates noncommercial speech, it must withstand a heightened level of scrutiny.").

Since Reed, some local governments have begun redrafting content-based, sign-related ordinances to apply solely to commercial speech.   Courts find these amended ordinances comply with Reed.  See, e.g., Geft Outdoor LLC v. Consolidated City of Indianapolis, No. 1:15-cv-01568-SEB-MJD, 2016 WL 2941329, *1-2 (S.D. Ind. May 20, 2016).

For the reasons stated below, the Court finds it must apply strict scrutiny to the Billboard Acts because it is a content-based regulation that implicates Thomas's non-commercial speech.  The Court then finds that the Billboard Act does not survive strict scrutiny; and thus, the Billboard Act is unconstitutional.

## III.    ANALYSIS

### A.    The Billboard Act Is Subject to Strict Scrutiny Because It Is a Content-Based Regulation that Implicates Thomas's Non-Commercial Speech

In this action, the Billboard Act is subject to strict scrutiny because it is a content-based regulation that implicates the non-commercial speech Thomas displayed on his Crossroad Fords sign.

The State contends that the Billboard Act is content neutral.  (ECF No. 336 at PageID 6718 n. 1.)  While on its face the Billboard Act articulates potentially content-neutral

restrictions—on-premises versus off-premises—the restrictions under the Billboard Act hinge on content.

In his concurring opinion in <u>Reed</u>, Justice Alito described the off-premises/on-premises distinction as content neutral. <u>Reed v. Town of Gilbert</u>, 135 S. Ct. 2218, 2233 (2015) (Alito, J., concurring). This Court agrees it is possible for a restriction that distinguishes between off- and on-premises signs to be content neutral. For example, a regulation that defines an off-premise sign as any sign within 500 feet of a building is content neutral. But if the off-premises/on-premises distinction hinges on the content of the message, it is not a content-neutral restriction. A contrary finding would read Justice Alito's concurrence as disagreeing with the majority in <u>Reed</u>. The Court declines such a reading. Justice Alito's exemplary list of "some rules that would not be content based" ought to be read in harmony with the majority's holding. <u>Id.</u> Read in harmony with the majority, Justice Alito's concurrence enumerates an "on-premises/off-premises" distinction that is not defined by the sign's content, but by the sign's physical location or other content-neutral factor.

The State previously argued the Billboard Act is content neutral because "it is entirely based on location or placement of the signs. An on-premises sign is one that is on the premises of an establishment, whereas an off-premises sign does not have a premises as such. It is logical to distinguish between the two by reference to place." (ECF No. 118 at 6.) But as the Court determined in its June 24, 2015 Order, "[t]he only way to determine whether a sign is an on-premise sign, is to consider the content of the sign and determine whether that content is sufficiently related to the 'activities conducted on the property on which they are located.'" (ECF No. 110 at 8 (quoting § 107(a)(1)).) Shawn Bible, Beautification Coordinator at TDOT, confirmed the State's use of "a premises test and a purpose test. Is it on the premises it is

15

supposed to be on? And is its purpose advertising what's happening there or that business is informing." (ECF No. 334 at PageIDs 6634:24-25 – 6635:1-2.) Bible also conceded that a sign "has to have some words on it to connect it to the premises. . . . So [the State is] looking at the content of [the] sign to make [a] determination whether it's on premises or off premises. . . ." (Id. at PageID 6663:12-21.)

The statutes' language, the State's rules, and the State's actions as to Thomas's non-commercial messages on his Crossroads Ford sign further compel a finding that the Billboard Act is content based. The Billboard Act imposes location, permit, and tag requirements on signs, unless they qualify as an exception or exemption. The language of the Billboard Act requires one to assess the sign's content to determine if it is exempt. Signs that advertise activities conducted or the sale/lease of the property on which they are located are exempted from the location, permit, and tag requirements. T.C.A. §§ 54-21-103(1)-(3), 54-21-107(a)(1)-(2). In practice, the State also uses a two-step inquiry knowns as the "premise and purpose test," which requires that the sign's content identify an activity/sale/lease on the property where the sign is located before it qualifies for exemption. (ECF No. 46-6 at PageIDs 718-19 (quoting Rule 1680-02-03-.06(2)). In other words, first, the sign "has to be on that property where the activity is taking place . . . ." (ECF No. 121 at PageID 1523 (testimony of Shawn Bible, Beautification Coordinator, TDOT).) Second, the sign "has to be advertising or speaking up for the things going on there at that premise." (Id. at PageIDs 1523-24.) The State contends that Thomas's previous displays on his Crossroads Ford sign, like "an American flag with the Olympic rings" (ECF No. 45 at PageID 563), did not "fall within the well-established guidelines in the Rule" (ECF No. 46-6 at PageID 719; see also ECF No. 46-6 at PageID 721). The State, therefore, seeks to remove Thomas's Crossroads

Ford sign because it is displayed without a permit.  (ECF Nos. 17 ¶ 27; 79 ¶ 27.)   In short, the

State argues that Thomas's sign must be regulated because its non-commercial message does

not "speak[] up for the things going on there at that premise."  (Test. Shawn Bible,

Beautification Coordinator at TDOT, ECF No. 121 at PageIDs 1523:10-1524:11.)  Thus, the

statute's language, the State's rules, and the State's reasoning support a finding that the

Billboard Act is content based.

After Reed, if a sign's application hinges on the content of the message, it is content

based.  For example, in Cent. Radio Co. Inc. v. City of Norfolk, Va., the Fourth Circuit Court

of Appeals held a city regulation that

> exempted governmental or religious flags and emblems, but applied to private and
> secular flags and emblems . . . [and] exempted 'works of art' that 'in no way
> identif[ied] or specifically relate[d] to a product or service,' but [ ] applied to art that
> referenced a product or service. . . was content-based because it applied or did not
> apply as a result of content, that is, 'the topic discussed or the idea or message
> expressed.'

811 F.3d 625, 633 (4th Cir. 2016) (quoting Reed, 135 S.Ct. at 2227).  Likewise, in the instant

case, the applicability of the on-premises sign exemption depends on the sign's content, i.e.

the content must concern activity on the site where the sign is located.  (See ECF No. 46-6 at

PageIDs 718-19 (quoting Rule 1680-02-03-.06(2)).  Even "though [the on-premises/off-

premises distinction appears] facially content neutral, [it ultimately] cannot be 'justified

without reference to the content of the regulated speech,'" and thus is a content-based

regulation.  Reed, 135 S. Ct. at 2222.

In the instant case, the Billboard Act is subject to strict scrutiny because, while it

regulates both commercial and non-commercial speech, the language at issue is the non-

commercial message(s) in Thomas's Crossroads Ford sign.  The State concedes that the

Billboard Act's on-premises/off-premises provisions apply to both commercial and non-commercial speech and that "[a] message can [ ] be commercial or non-commercial as long as there is some connection."  (ECF Nos. 64 at PageID 917, 344 at 10.)  There is no question that Thomas's Crossford Sign displaying an American flag and Olympic rings is non-commercial speech.  (See ECF No. 45 at PageID 563.)  Because the Billboard Act is a content-based regulation that applies to both commercial and non-commercial speech, and because the nature of the speech at issue is non-commercial, the Billboard Act must survive strict scrutiny to be found constitutional.  See PHN Motors, 498 F. App'x at 543–44.

### B.    The Billboard Act Does Not Survive Strict Scrutiny

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  Reed, 135 S.Ct. at 2231.  Even if the government's interests are compelling, "it is the rare case in which a speech restriction withstands strict scrutiny."  Id. at 2236 (Kagan, J., concurring in the judgment) (citing Williams–Yulee v. Fla. Bar, ––– U.S. ––––, 135 S.Ct. 1656, 1666 (2015)).  If a less restrictive alternative for achieving that interest exists, the government "must use that alternative."  United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000).   "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."  Id. at 816.

For the reasons stated below, the Billboard Act fails under strict scrutiny.  The Court first finds that the State's interests are not compelling, but even if they were, the Court finds the Billboard Act is not narrowly tailored to the those interests.

### 1. The State's Interest Are Not Compelling

The State sets out "six compelling State interests: Driver Safety, Promote Recreational Value of Public Travel, Promote Tourism, Promote Economic Development, Protect Investments in Public Highways and Preserve Scenic Beauty." (ECF No. 336 at PageID 6720.) First, the State contends that "if there were no Billboard Act, and billboards were allowed to proliferate, that would lead to further distraction and could cause more accidents." (Id. at PageID 6721.)

Second, the State argues that "[t]he Billboard Act engenders [ ] recreational travel by helping keep the roads more driver friendly and scenic." (Id. at PageID 6725.) The State does not offer proof, however, that the Billboard Act actually influences recreational travel.

Third, the State asserts "that billboards and other signs detract from the natural beauty that visitors say that they travel to and within Tennessee to see." (Id. at PageIDs 6726-27.) Yet the State admits it has no statistical evidence that the Billboard Act influences tourism. (Id.)

Fourth, the State argues that "how the roadways in Tennessee *look* plays an important part in attracting new businesses to the State." (Id. at PageID 6727 (emphasis added).) The State's bases this argument entirely on testimony from "Commissioner Schroer, a businessman and entrepreneur himself, who is familiar with the business industry and the needs of businesses in Tennessee" and believes "attractive roads [are] critical to economic development." (Id. at PageID 6737.) Commissioner Schroer's testimony offers little in terms of statistical or differential analysis documenting an actual link between "attractive roads"

verses, for example, "good roads" and economic development.[4]  Rather, Commissioner

Schroer's testimony correlates the maintenance and building of roads, sans reference to

aesthetics, with transportation to and from Tennessee businesses.[5]  Moreover, because

Commissioner Schroer is a fact witness and not an economic expert (ECF No. 270 ¶ 5), and

because his opinion testimony on how roadway aesthetics influence economics would require

specialized knowledge, his testimony is impermissible lay opinion.  Fed. R. Evid. 701(c) ("If a

witness is not testifying as an expert, testimony in the form of an opinion is limited to one that

is . . . not based on scientific, technical, or other specialized knowledge within the scope of

Rule 702.").  The Court, therefore, finds Commissioner Schroer's testimony unpersuasive and

unsupportive of the State's position that the Billboard Act ensures more attractive roads and

those attractive roads are critical to economic development.

Fifth, the State discusses the public investment in the building and maintenance of the

roads.  (ECF No. 336 at PageIDs 6727-28.)  Yet the State does not establish that the Billboard

Act directly impacts this public investment, and merely repeats that "[o]f course the major

---

[4] When asked if he conducted an independent study as to how roadways impact business recruitment to Tennessee, Commissioner Schroer states,

> You know, the best way I can answer that is, having talked to executives of companies that come to the State of Tennessee, they're very clear that what we did helped them make a decision to come to Tennessee.  So, you know, that's as independent as I think I need is from the company themselves, telling me how important our capital investment was when they're making a decision to come to Tennessee.

(Trial Tr., ECF No. 333 at PageID 6392:11-19.)

[5] Commissioner Schroer testified,

> I can say as an example, in 2015 about 167 businesses relocated to the State of Tennessee with about a $5.5 billion investment. . . .  [T]ransportation has a huge part of that and that almost all of those deals, those businesses that come in the State of Tennessee have some need of transportation.  And often times it's just the interstate system itself, they want to get their goods and products to wherever they are going.  But many times they also need a road to their business to their factory or whatever it is, and we provide those as part of our process. . . .  Volkswagen as an example has a huge plant in Chattanooga, and we spent over $30 million to open an interchange. . . .  Academy Sports located a $1.7 million or million square feet facility in Cookeville, Tennessee that we are providing both an interchange and an access road from the interchange into their facility.

(Trial Tr., ECF No. 332 at PageIDs 6344:2-25 – 6345:1-4.)

concern is safety of the motoring public. . . .  In fact, safety is the key asset in a roadway. . . . The State takes care to have signs that are appropriately spaced and not clutters [sic] because sign clutter can lead to distracted driving."  (Id. at PageID 6728.)

Sixth, the State argues that "[p]rotecting and preserving the natural scenic beauty is [ ] a compelling interest for the State of Tennessee."  (Id. at PageID 6729.)[6]

Despite presenting six seemingly separate arguments, the State's position can be distilled into two concepts.  First, the State's tourism, recreation, economic development, and scenic beauty arguments all hinge on roadway aesthetics.  Second, the State's driver safety and public investment arguments all hinge on traffic safety.  In short, the State contends that the Billboard Act prevents the proliferation of billboards, which, in turn, improves (1) aesthetics and (2) traffic safety.  Neither of these arguments, however, constitutes a compelling interest.

Although the Sixth Circuit has held that aesthetics and highway safety are substantial or significant governmental interests, Wheeler v. Comm'r of Highways, Com. of Ky., 822 F.2d 586, 589 (6th Cir. 1987); Hucul Advert., LLC v. Charter Twp. of Gaines, 748 F.3d 273, 278 (6th Cir. 2014); Prime Media, Inc. v. City of Brentwood, Tenn., 398 F.3d 814, 821 (6th Cir. 2005), neither the Sixth Circuit nor the Supreme Court has held that these interests are compelling under strict scrutiny.  Wagner v. City of Garfield Heights, No. 13-3474, 2017 WL 129034, at *6 (6th Cir. Jan. 13, 2017) ("We will follow the Court's example in Reed and

---

[6] Although not listed as a compelling interest, the State also mentions federal funding, and argues that although "the need to continue Federal funding may not be a 'compelling' State interest, it is at the least a legitimate interest that, along with the compelling interests that the State proved, shows the [sic] Tennessee has a compelling State interest (or interests) in the Billboard Act."  (Id. at PageID 6731.)  This Court previously found that federal funding is irrelevant to the strict scrutiny analysis.  (ECF No. 315 at PageID 6154.)  Other courts agree with this finding: "[T]he desire to secure a [State's] funding is, of course, not a compelling interest that would justify the suppression of . . . First Amendment speech. . . ."  Villejo v. City of San Antonio, 485 F. Supp. 2d 777, 783 (W.D. Tex. 2007).

assume without deciding that these interests are sufficiently compelling."); see Reed v. Town

of Gilbert, Ariz., 135 S. Ct. 2218, 2223 (2015). Some courts have found neither aesthetics nor

traffic safety constitute compelling interests. Neighborhood Enters., Inc. v. City of St. Louis,

644 F.3d 728, 738 (8th Cir. 2011); cf. Dimmitt v. City of Clearwater, 985 F.2d 1565, 1569–70

(11th Cir. 1993) (finding that the evidence fell short of establishing a compelling state interest

in visual aesthetics and traffic safety that would justify content-based regulation of

noncommercial speech); McCormack v. Twp. of Clinton, 872 F.Supp. 1320, 1325 n. 2 (D.N.J.

1994) (noting that "while courts certainly have recognized states' and municipalities' interests

in aesthetics and safety, no court has ever held that these interests form a compelling

justification for a content-based restriction" of non-commercial speech). "[T]he promotion of

tourism and business has [also] never been found to be a compelling government interest for

the purposes of the First Amendment." McLaughlin v. City of Lowell, 140 F. Supp. 3d 177,

189 (D. Mass. 2015) (citing Pottinger v. City of Miami, 810 F.Supp. 1551, 1581 (S.D. Fla.

1992)).

> In previous rulings, the Supreme Court has made it clear that

> content-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories [of expression] long familiar to the bar, including advocacy intended, and likely, to incite imminent lawless action . . . obscenity . . . defamation . . . speech integral to criminal conduct . . . so-called 'fighting words,' . . . child pornography . . . fraud . . . true threats . . . and speech presenting some grave and imminent threat the government has the power to prevent.

United States v. Alvarez, 132 S. Ct. 2537, 2544, 183 L. Ed. 2d 574 (2012) (internal quotation

marks omitted). The compelling interests underlying these categories are similar: the

government has a compelling interest in regulating content that is false, criminal and/or

provokes crime, or lawless.

The Supreme Court also mandates that the government's compelling interest must be related to the speech-based distinctions the regulation makes. Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 120 (1991) (concluding that the disparate treatment of storytelling criminal speech was completely unrelated to the State's compelling interest in ensuring that crime victims were compensated from the fruits of the crimes committed against them and that any interest the State might have had in imposing such a content-based disincentive on speech was not compelling); Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U.S. 575, 586 (1983) (holding that the State's compelling interest in raising tax revenue through taxation did not justify selective taxation of the press since such interest was altogether unrelated to the press/nonpress distinction); Carey v. Brown, 447 U.S. 455, 467-69 (1980) (finding that the State's compelling interest in preserving privacy by banning residential picketing did not justify a selective ban on nonlabor picketing since the interest was unrelated to the labor/nonlabor distinction).

In the instant case, the Court finds the State's interests in aesthetics and traffic safety are not compelling interests. Not only are such general and abstract interests generally not considered so compelling as to justify content-based sign restrictions, but also, they are unrelated to the distinction between signs with on-premises-related content versus other messages. Also, in practice this distinction undermines the State's interests. As discussed above, no binding authority supports the State's compelling interests of aesthetics and traffic safety. These interests also fall short of what the Supreme Court has deemed appropriate for content-based-restrictions. Thus, the Court finds the State's aesthetic and traffic safety interests are not compelling enough to justify content-based restrictions.

The State has also failed to establish that its interests are related to the Billboard Act's content-based restriction. The provisions at issue here concern the distinction between signs with content concerning on-premises-related activity versus other messages. The State fails to establish how this specific distinction relates to traffic safety and aesthetics. For example, the State's expert witness on traffic safety, Colonel Tracy Trott, testified that "the number of crashes related to distraction and the number of injury crashes related to distraction are definitely on an upward trend." (Trial Tr., ECF No. 333 at PageID 6483:10-11.) This "upward trend," however, occurred while the Billboard Act was in full force. Also, the statistics Colonel Trott relied on do not reference billboards or signs as causes for distracted driving or distracted driving accidents. Colonel Trott also opined that a proliferation of billboards would likely aggravate distracted driving issues. (Id. at PageID 6488:7-17.) Notably, Colonel Trott does not suggest that signs whose content concerns on-premises-related activity pose a greater or less driving distraction than other signs; rather, he suggests that signs with more content and signs outside the driver's field of vision may create greater distractions. He specifically states that signs are "less distracting [when] they're usually in your field of vision that you're using to drive with" and signs that need "to be read or deciphered or retained" would be potentially more distracting than signs that evoke instant recognition, i.e. "I would know the golden arches for McDonald's or BP for gasoline, I know that that facility sits at the bottom of that sign; and it's a very quick glance and back to the road." (Id. at PageIDs 6488:22-24, 6503:20-25.)

The State's civil engineering and human factors engineering expert, TDOT Transportation Specialist Jason Moody, also failed to establish how the on-premises/off-premises distinction relates to the State's traffic safety interest. (See ECF Nos. 270 ¶ 6.)

Moody merely opined that the placement of signs "directly adjacent to a roadway" may "draw attention. If you can't view them for enough to read the message properly, that could cause you to turn your head to read the full message." (Id. at PageID 6546:20-23.) Moody also testified that billboards are generally

> spaced parallel with the road, turned perpendicular to the road so that drivers can see them. They're at the back of the right-of-way, but they're at the edge of the cone of vision. So, that's why you see them using such -- they're not in the primary cone or the cone right in front where we place our signs. So, the text has to be much larger to be read. They're usually behind our right-of-way.
>
> Q: Based on your learning and experience, tell us whether billboards are a factor in the area of distracted driving.
>
> A: Yes.

(Id. at PageIDs 6545:17-23, 6546:1.) Moody, like Colonel Trott, does not opine on whether signs with on-premises-related activity content are more or less distracting than other messages. Although Moody's and Colonel Trott's testimony establishes that billboards generally distract drivers, and that the State may have a compelling interest in curtailing all billboards, their testimony fails to establish how the Billboard Act's on-premises/off-premises distinction is related to the State's interest in traffic safety.

Similarly, the State has failed to establish how its interest in aesthetics is related to the Billboard Act's on-premises/off-premises distinction. The State's witness John Carr, Assistant Commissioner of Administration for the Department of Tourist Development, testified that "[t]ouring and sightseeing, visiting historic sites, going to some of the parks" are some of the primary scenic activities visitors come to Tennessee enjoy. (Trial Tr., ECF No. 333 at PageID 6444:7-9.) Carr, however, does not discuss whether signs with messages that do not concern on-premises activity impact aesthetics. Shawn Bible, Beautification Coordinator at TDOT, testified that zoning, rather than a distinction between on-premises

versus off-premises signs, ensures that there are not "billboards blocking the beautiful rural views or hanging over residences." (ECF No. 334 at PageID 6640:17-25.)

The State also provides no further evidence that the distinction at issue relates to its aesthetic interest. The State merely states "the Billboard Act engenders [ ] recreational travel by helping keep the roads more driver friendly and scenic." (ECF No. 336 at PageID 6725.) While the Billboard Act as a whole may result in more scenic roads, no evidence establishes that the Billboard Act's on-premises/off-premises distinction relates to the State's aesthetic interest.

In practice, the Billboard Act's on-premises/off-premises distinction may undermine the State's interests. For example, a small sign with muted colors that says "Knowledge is Power" off of 1-40 would require a permit and tag, and compliance with the six-hundred-sixty (660)-foot restriction. Conversely, a large sign with loud colors that states "This property is for sale. Right here. This one. The one this sign is on. Look at this sign. Look at this property," would require no permit or tag, and could be placed closer to another sign and the roadway. The exempted "for sale" sign that is bigger, brighter, contains more words, and closer to another sign and road would certainly be a distraction and eye-sore under the State's evidence. The regulated "Knowledge is Power" sign, on the other hand, would be less of either. Thus, the Billboard Act's on-premises/off-premises distinction undermines the State's articulated interests.

In sum, the State's aesthetic and traffic safety interests are not so compelling as to justify content-based sign restrictions, because they are unrelated to the Billboard Act's on-

premises/off-premises distinction, and because, in practice, the Billboard Act's on-premises/off-premises distinction undermines the State's interests.

Despite finding that the State's interests are not compelling, the Court will assume the State's interests are compelling and turn to whether the Billboard Act is narrowly tailored to the State's compelling interests.

**2.    The Billboard Act Is Not Narrowly Tailored to the State's Compelling Interests**

A law regulating speech is not narrowly tailored if it fails to advance the government's interests; the law is also not narrowly tailored if it is either under- or overinclusive, and is not the least restrictive means among available, effective alternatives.  See Reed, 135 S.Ct. at 2231–32; Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd., 502 U.S. 105, 121–23 (1991); Burson v. Freeman, 504 U.S. 191, 207 (1992); Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 666 (2004).

For the reasons stated below, the Court finds that even if the State's interests were compelling, the Billboard Act is not narrowly tailored to achieve those interests.

**i.    Advancing the State's Compelling Interests**

The State argues that the Billboard Act advances all of its compelling interests.  (ECF No. 336 at PageID 6732.)  The State contends that the Billboard Act's restrictions are fourfold: "location (zoning), spacing, size and lighting."  (Id.)  The State argues that these four restrictions render the Billboard Act narrowly tailored because

> a proliferation of billboard would be detrimental to driver safety[;] . . . would be a blight on the landscape and mar the . . . scenic beauty, promoting recreational travel and promoting tourism[;] . . . cause more distraction . . . [that] lead to more crashes, and then road congestion[;] . . . negatively impact

economic development and quality of life . . . [and] negatively impact the investment in safety. . . .

(Id. at PageIDs 6733-37.)

The State confuses the issues. The present issue is whether the Billboard Act's exemption and exception provisions are narrowly tailored to the State's compelling interests. The State's argument, however, refers to the Billboard Act generally and relies on a hypothetical, unproven negative. Without proof, the State contends that without the Billboard Act there would be a proliferation of billboards. Assuming a proliferation of signs would occur without the Billboard Act, the State has failed to establish how the provisions at issue— T.C.A. §§ 54-21-103(1)-(3), 54-21-107(a)(1)-(2)—advance the State's compelling interests. Specifically, the State has not shown how a distinction between on-premises and off-premises signs advances aesthetics and traffic safety.

The State attempts to justify the on-premises/off-premises distinction in four ways: First, the State argues that "[o]n-premise signs enhance safety by helping drivers locate relevant businesses and activities." (Id. at PageID 6740.) Second, the State contends "[t]he impact on aesthetics [by on-premises signs] is minimal because the signs are already integrated with the current land use." (Id.) Third, the State asserts that "[o]n-premise signs are inherently self-regulating . . . [because] [o]wners of businesses do not want to spend valuable real estate putting up a number of signs – that space is better utilized for the business itself." (Id. at PageID 6741.) Fourth, off-premises signs are "designed to draw your attention away from the road to read the message displayed on the billboard or sign . . . they use

colorful pictures and other distractions to draw your attention . . . [and thus] [t]hey serve to distract, not protect." (Id. at PageID 6742.)[7]  The Court addresses each argument in turn.

First, the traffic-safety evidence the State proffers relates to distracted driving, and the State has not established that on-premises signs are less distracting than off-premises signs. The opposite may be true.  On-premises signs are not subject to permit, tag, and location restrictions, they may be more distracting than an off-premises sign.  Second, there is no evidentiary support for the State's proposition that on-premises signs have less of an impact on aesthetics than off-premises signs.  If the sign's content concerns activity on the premises, the premise owner may make as many signs as he chooses and he may make them as ostentatious as he chooses.  Third, the State's conclusory assertion that business owners do not want to put up numerous signs is speculative and lacks evidentiary support.  (See id. at PageID 6741.)  The assertion would certainly not be true for many firework vendors.[8]  Fourth, the fundamental purpose of all signs, regardless of content, is "to draw your attention away" from the current task "to read the message displayed on the billboard or sign."[9]  By the State's logic, this would mean all signs "serve to distract, not protect."  Accordingly, this argument does not justify the Billboard Act's on-premises/off-premises sign distinction.  The Court is unpersuaded that the Billboard Act advances the State's compelling interest, and finds the on-

---

[7] The State presented these four arguments to support the proposition that the Billboard Act is not underinclusive.  The Court finds, however, that these arguments also speak to whether the Billboard Act's exemption and exception provisions advance the State's compelling interests.

[8] It is common knowledge in the court's jurisdiction that firework vendors signs are often numerous and flashy.  See Fed. R. Evid. 201(b)(1) ("[T]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction."); see also ECF No. 150 at PageID 2134-35 ("COURT: You have seen those big signs when you're coming out of Chattanooga where you have got the signs about fireworks -- is it in Alabama? MS. JORDAN: Yes, yes.  I have seen -- definitely seen those, yes.  COURT: Isn't that Sign in Tennessee?  MS. JORDAN: I believe that it is.  I honestly don't know.  I know what you're talking about, I know what you're referring to, I don't know whether that's in Tennessee or not, but it's definitely on I-24 and is -- yeah, there's several of those.  There's one in particular that I can —")

[9] Shawn Bible, Beautification Coordinator at TDOT, when asked "would you agree that the purpose of a billboard sign is to express meaning or content to someone?" testified, "yes."  (ECF No. 334 at PageID 6657:14-17.)

premises/off-premises distinction actually undermines the State's articulated interests in practice.

The Court, therefore, finds the provisions of the Billboard Act at issue do not advance the State's compelling interests. The Court need not inquire further. If the Billboard Act does not advance the State's compelling interests, it is not narrowly tailored and thus is unconstitutional. For completeness, however, the Court will also consider whether the Billboard Act is overinclusive or underinclusive, and the least restrictive means.

## ii.      Overinclusive

A law regulating speech is overinclusive if it implicates more speech than necessary to advance the government's interest(s). Simon & Schuster, 502 U.S. at 121–23. For example, in Simon & Schuster, the law at issue required that an accused or convicted criminal's income from works describing his crime be deposited in an escrow account and made available to the victims of the crime and the criminal's other creditors. 502 U.S. at 108. The Supreme Court held that the law was a "significantly overinclusive" means of ensuring that victims are compensated from the proceeds of the crime, and therefore the law was not narrowly tailored. Id. at 121, 123. Describing the reach of the statute, the Supreme Court stated:

> Should a prominent figure write his autobiography at the end of his career, and include in an early chapter a brief recollection of having stolen . . . a nearly worthless item as a youthful prank, the [government entity] would control his entire income from the book for five years, and would make that income available to all of the author's creditors. . . .

Id. at 123. That is, the statute applied to a wide range of literature that would not enable a criminal to profit while a victim remained uncompensated. Because the law covered far more

material than necessary to accomplish its goals, the Supreme Court held that the statute was vastly overinclusive and therefore not narrowly tailored.  Id.

The State argues the Billboard Act is not overinclusive because it "does not regulate content."  (ECF No. 336 at PageID 6737.)  The Court disagrees that the Billboard Act does not regulate content.  The Billboard Act is a content-based regulation, as the application of the exemption and exception provisions hinges on the sign's content.  It is also at least arguable that the Billboard Act is overinclusive.  At the center of the State's interests is the desire to limit highly distracting signs that impede traffic safety and diminish aesthetics.  While the Billboard Act regulates off-premises signs that are highly distracting, it also regulates off-premises signs that are not highly distracting.  For example, an off-premises sign that mimics the "Hollywood" sign in Los Angeles, California in enormous size[10] and is located off an Interstate regulated by the Billboard Act in Tennessee would be regulated to the same extent as a small, off-premises sign, located in the same place that stated, "Donate Winter Coats at the YMCA. Exit 13."  In practice, the Billboard Act is likely overinclusive.  Even assuming the Billboard Act is not overinclusive, however, the Court finds it is underinclusive.

### iii.      Underinclusive

An underinclusive law regulates less speech than necessary to advance the government's interest(s).  Florida Star v. B.J.F., 491 U.S. 524, 540 (1989); cf. Burson, 504 U.S., at 207, 112 S.Ct. 1846 ("The First Amendment does not require States to regulate for problems that do not exist."); see also Wagner v. City of Garfield Heights, No. 13-3474, 2017 WL 129034, at *6 (6th Cir. Jan. 13, 2017) (finding that a law limiting the size of political

---

[10] Pursuant to Federal Rule of Evidence 702(b)(2), the Court takes judicial notice of Los Angeles Historic-Cultural Monument No. 111 "Hollywood Sign & land underneath."  Historic-Cultural Monument List: City Declared Monuments by Planning Community (Feb. 2017), http://preservation.lacity.org/commission/designated-historic-cultural-monuments.

signs was underinclusive as to the city's aesthetic and traffic safety interests, because the display of larger, non-political signs would counteract those interests).   For the reasons stated below, the Court finds the Billboard Act is underinclusive, as it regulates less speech than necessary to advance the State's allegedly compelling interests.

The State argues that the Billboard Act is not underinclusive because on-premises/off-premises distinctions are content-neutral regulations under Supreme Court precedent and do not favor one message over another under Sixth Circuit precedent.  (ECF No. 336 at PageIDs 6739-40 (citing Suffolk Outdoor Advertising Co. v. Hulse, 439 U.S. 808 (1978); Metro-Media, Inc. v. City of San Diego, 453 U.S. 490, 508-12 (1981); Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 806-07 (1984); City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 425 (1993); Reed v. Town of Gilbert, 135 S.Ct. 2218, 2233 (2015) and Wheeler v. Commissioner of Highways, 822 F.2d 586, 591 (6th Cir. 1987).)  The State also sets out the four arguments discussed above: (1) "[o]n-premise signs enhance safety by helping drivers locate relevant businesses and activities" (ECF No. 336 at PageID 6740); (2) "[t]he impact on aesthetics [by on-premises signs] is minimal because the signs are already integrated with the current land use" (id.); (3) "[o]n-premise signs are inherently self-regulating . . . [because] [o]wners of businesses do not want to spend valuable real estate putting up a number of signs" (id. at PageID 6741); and (4) off-premises signs are "designed to draw your attention away from the road to read the message displayed on the billboard or sign . . . [and thus] [t]hey serve to distract, not protect" (id. at PageID 6742).   For the reasons stated below, the Court finds the Billboard Act is underinclusive, as it regulates less speech than necessary to advance the State's compelling interests.

The State's content-neutral argument is baseless; although it is possible for an on-premises/off-premises regulation to be content neutral, the Court finds the Billboard Act's on-premises/off-premises distinction is content based because the distinction under the Billboard Act's provisions hinges on the sign's content. The State's remaining arguments fail to sufficiently disprove that the Billboard Act is underinclusive by regulating less speech than necessary to advance the State's interests.

The Court's reasoning in the instant case mirrors the Sixth Circuit's reasoning in Wagner v. City of Garfield Heights, No. 13-3474, 2017 WL 129034, at *6 (6th Cir. Jan. 13, 2017). In Wagner, the Sixth Circuit used Reed's analysis to hold that a sign ordinance "that expressly limits political signs to six square feet, but permits other kinds of temporary signs to be twice that size" was underinclusive, because the city "offer[ed] no rationale for why political signs, as opposed to a signs advertising local businesses, mar the city's aesthetic appeal in such a way as to merit an arbitrarily smaller size restriction." Id. at *6. Similarly, in the instant case, the State has "offer[ed] no rationale for why [signs displaying non-premises-related content], as opposed to [signs displaying on-premises-related content] mar the [State's] aesthetic appeal in such a way as to merit an arbitrary [permit, tag, and location] restriction." Id. As discussed above, the Billboard Act's exemption and exception provisions would absolve large, ostentatious on-premises signs that are closely placed together from the permit, tag, and location requirement while regulating small, muted off-premises signs. See Part III.B.1. Moreover, the State's conclusory arguments that on-premises signs "are already integrated with the current land use" (ECF No. 336 at PageID 6740), and that business owners avoid displaying multiple signs (id. at PageID 6741) lack evidentiary support and merit. Aesthetics are not measured by how relevant the sign's content is to the on-premises activity.

One can easily anticipate a scenario where a business chooses to display many obnoxious signs advertising its activity—e.g., firework vendors. Significantly, the State presents no evidence that business owners choose to limit the number of signs on their property. Therefore, the Court finds that the Billboard Act regulates less speech than necessary to advance the State's aesthetic interests.

This finding is supported by the Sixth Circuit Court of Appeal's holding in <u>Wagner</u>. In that post-<u>Reed</u> case, the Circuit Court of Appeals held that the city "'similarly has not shown that limiting temporary [political] signs is necessary to eliminate threats to traffic safety, but that limiting other types of signs is not.'" <u>Id.</u> (quoting <u>Reed</u>, 135 S. Ct. at 2232.) The same reasoning is applicable in this case. The State "'has not shown how [instituting permit, tag, and location requirements for signs displaying non-premises-related content] is necessary to eliminate threats to traffic safety, but that [having the same requirements] for other types of signs is not.'" <u>Id.</u> The State's argument that on-premises signs "help[] drivers locate relevant businesses and activities" (ECF No. 336 at PageID 6740) does not establish why on-premises signs are not subject to permit, tag, and location requirements. These requirements would not change the sign's content, so it would maintain its helpful purpose. Also, the State's assertion that off-premises signs are "designed to draw your attention away from the road to read the message displayed on the billboard or sign . . . [and thus] [t]hey serve to distract, not protect" (<u>id.</u> at PageID 6742) is nonsensical, as all signs are designed with this purpose. This argument, therefore, does not establish why it is necessary to regulate off-premises signs and not on-premises signs to eliminate threats to traffic safety. Thus, the Billboard Act regulates less speech than necessary to advance the State's traffic-safety-related interests.

For the reasons stated above, the Court finds the Billboard Act is underinclusive, as it regulates less speech than necessary to advance the State's allegedly compelling interests.

### iv. Least Restrictive Means

The Court finds that the provisions at issue are not narrowly tailored because they are not the least restrictive means by which the State may further its interests. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. . . . To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000) (internal citations omitted); see also McCullen v. Coakley, 134 S. Ct. 2518, 2530 (2014); Bible Believers v. Wayne Cty., Mich., 805 F.3d 228, 248 (6th Cir. 2015), cert. denied, 136 S. Ct. 2013 (2016). "[T]he challenged regulation [must be] the least restrictive means among available, effective alternatives." Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 666 (2004).

The Court ordered the parties to brief the issue of least restrictive means. (ECF No. 342.) Thomas posits eight alternative means that he argues would advance the State's allegedly compelling interests. (ECF No. 343.) First, Thomas suggests that the Billboard Act regulate only commercial speech. (Id. at PageID 6787.) Second, Thomas proposes a regulation limiting sign size, regardless of content. (Id. at PageID 6788.) Third, Thomas suggests a spacing restriction for all signs, regardless of content. (Id. at PageID 6789.) Fourth, Thomas proposes a regulation that would allow property owners to display any sign on their property, regardless of content. (Id. at PageID 6790.) Fifth, Thomas proposes distinguishing between signs based on whether they are placed on public rights-of-way or on private property. (Id. at PageID 6790.) Sixth, Thomas posits creating a provision that allows

"non-commercial speech [to] be displayed anywhere commercial speech is permitted."  (Id. at PageID 6791.)  Seventh, Thomas suggests requiring all signs, regardless of content, to be placed a minimum distance apart from one another.  (Id.)  Eighth, Thomas proposes restricting all signs to specific presentation characteristics, e.g., size, lights, colors, font size, electronic messages, or moving parts.  (Id. at PageID 6791.)

In its response, the State contends that none of the alternatives proffered by Thomas would achieve the State's interests.  (ECF No. 344 at PageID 6795.)  The Court addresses, in turn, each of the alternatives in conjunction with the State's responses.

### 1.      Non-Commercial/Commercial Distinction

First, the State contends that limiting the Billboard Act to only commercial speech "would be inherently content-based because it would require a review of the message, no matter the location, to determine whether it is in fact non-commercial" or commercial speech. (Id. at PageID 6797.)  Additionally, the State argues, exempting non-commercial speech from regulation would not advance the State's compelling interests, as it would allow non-commercial signs to proliferate.  (Id. at PageID 6798.)  The State also takes issue with this proposal because "the State would have to constantly be on alert and watch the signs because there will be occasions where sign owners will place commercial messages on the signs, but then change to non-commercial content if caught, then revert back to commercial."  (Id.)

The Court is unpersuaded by the State's argument that limiting the Billboard Act to only commercial speech would render the Billboard Act content based.  Although this is an

issue litigated in our sister courts,[11] the Court declines to find that limiting the Billboard Act to only commercial speech would constitute a content-based regulation. Nonetheless, even if limiting the Billboard Act to commercial speech would render it a content-based regulation, its provisions would then be subject to a lower level of scrutiny. Under a less burdensome inquiry, a content-based regulation of commercial speech may be constitutional. Similar regulations have been found constitutional after Reed. See, e.g., Geft Outdoor LLC v. Consol. City of Indianapolis & Cty. of Marion, Indiana, 187 F. Supp. 3d 1002, 1007 (S.D. Ind. 2016) (finding constitutional an amended, on-premises/off-premises distinction that applied only to commercial speech). The State's contention that a non-commercial/commercial distinction would be more burdensome than the current on-premises/off-premises distinction is invalid. It is no more burdensome on the State "to constantly be on alert . . . [for when] sign owners [ ] place [off-premises] messages on the signs, but then change to [on-premises] content if caught, then revert back to [off-premises content]." (ECF No. 344 at PageID 6798.) The Court also finds that while a non-commercial/commercial distinction still advances the State's compelling interests, it may not do so to the same extent as the current on-premises/off-premises distinction, which applies to all speech. In short, a non-commercial/commercial distinction may be less effective but not ineffective.

## 2. Sign Size

Second, the State argues that Thomas "lacks standing to assert an alternative that would require all signs to conform to the same size restrictions. . . . [Moreover, regulating size

---

[11] See, e.g., RCP Publications Inc. v. City of Chicago, No. 15 C 11398, 2016 WL 4593830, at *3 (N.D. Ill. Sept. 2, 2016) (evaluating regulation that distinguished between commercial and non-commercial speech); CTIA-The Wireless Ass'n v. City of Berkeley, California, 139 F. Supp. 3d 1048, 1061 n.9 (N.D. Cal. 2015) ("Ironically, the classification of speech between commercial and noncommercial is itself a content-based distinction. Yet it cannot seriously be contended that such classification itself runs afoul of the First Amendment.").

for all signs] would not help Plaintiff because the regulations preclude his sign no matter what size it is."  (Id. at PageID 6799.)   Both claims are groundless.  The State's first claim that Thomas lacks standing to propose an alternative is without merit.  Proposing an alternative to a challenged provision does not require standing.  Thomas need only establish standing to challenge the Billboard Act's exemption and exception provisions, which he has.  The Court is also unpersuaded by the State's second assertion that regulating all signs by size would be unbeneficial to Thomas.  If the Billboard Act's on-premises/off-premises distinction was replaced with a size restriction, it is possible Thomas's Crossroad Ford sign would be exempt from the permit, tag, and location requirements, so long as its size complied with the restriction.

The Court finds that a size regulation, rather than an on-premises/off-premises distinction, would also further the State's compelling interests.  A size regulation would apply to both commercial and non-commercial speech.  A size regulation would also allow the State to further its traffic safety interest.  For example, the State could require all signs greater than four square feet to abide by the Billboard Act's permit, tag, and location requirements.  Although signs smaller than four square feet could "proliferate," their size could be less distracting to drivers than bigger signs.  Similarly, a size regulation would further the State's aesthetic interests because the smaller unregulated signs would make far less of a negative aesthetic impact than their larger counterparts.  Furthermore, the Court does not find that a size regulation would be less effective than the current on-premises/off-premises distinction.  Just as on-premises signs may proliferate, so long as their content relates to on-premises activity, so may signs that meet the size restriction.  Thus, the Court finds that a size regulation constitutes a less restrictive means of advancing the State's interests.

### 3. Spacing

Third, the State argues that Thomas's proposal that all signs be spaced five hundred (500) feet apart would be too restrictive. (See ECF No. 344 at PageID 6799.) The State asserts that the current "spacing requirements [under the Billboard Act are as follows]: 1,000 feet on interstates, 500 feet on primary state routes not on the interstate system, and 100 feet on primary State routes within cities." (Id.) A blanket 500-foot restriction, the State argues, would prevent business owners from adequately indicating their business's whereabouts to drivers and deprive some, but not all, property owners of their right to erect a sign. (Id. at PageIDs 6800-01.) The Court does not agree with the State's reasoning, but finds that Thomas's specific 500-foot restriction is not an effective, less restrictive alternative.

A more nuanced spacing restriction, however, may constitute an effective, less restrictive alternative. For example, the Billboard Act could be amended to have a spacing scheme that required 2,000 feet on interstates, 1000 feet on primary state routes not on the interstate system, and 200 feet on primary state routes within cities, along with a provision that allowed business or premises owners to erect additional signs if those signs were within 75 feet of an on-premises building. This amendment would limit the number of signs that could distract drivers or negatively impact aesthetics, while allowing business and organizations to display signs on their own property. The Court, therefore, finds that a spacing restriction constitutes as an effective, less restrictive alternative to the on-premises/off-premises distinction under the Billboard Act.

#### 4.      Exemption for Property Owners Erecting Signs

Fourth, the State contends that Thomas's "suggestion to allow property owners to put up signs on their own property without regard to zoning is the same as no regulation . . . [and] would do absolutely nothing to prevent proliferation. . . ." (Id. at PageID 6801.)  The Court similarly finds that Thomas's suggestion would fall short of advancing the State's interests. Property owners would be allowed to place signs of any size, at any distance, and of any number without regulation, which would undermine the State's compelling interests.  Thus, the Court finds an exemption for property owners is not an effective, less restrictive alternative.

#### 5.      Public/Private Property

Fifth, the State contends that Thomas's proposal to "treat" all public and private property signs the "same" is confusing, unless Thomas seeks to subject all signs to the Manual on Uniform Traffic Control Devices ("MUTCD"), T.C.A. § 54-5-108(b).  (Id. at PageIDs 6801-02.)  The State argues, however, that these restrictions would be overinclusive.  (Id. at PageID 6802.)  The Court agrees.  The MUTCD provisions would regulate more speech than necessary to advance the State's interests; thus, treating all public and private signs the same would not serve as a less restrictive alternative.   The Court notes, however, that an ordinance that exempted only signs that complied with MUTCD, while requiring that all other signs abide by the Billboard Act's permit, tag, and location requirements may be constitutional.  See Ackerley Commc'ns of Massachusetts, Inc. v. City of Cambridge, 88 F.3d 33, 37 n.9 (1st Cir. 1996).

### 6. Permitting Non-Commercial Signs Wherever Commercial Signs are Permitted

Sixth, the State opposes Thomas's proposal that the Billboard Act permit non-commercial signs wherever commercial signs are permitted, because the State contends the Billboard Act already permits the erection of non-commercial signs wherever commercial signs may be erected. (Id. at PageID 6803.) Sixth Circuit precedent supports the State's argument. Wheeler v. Comm'r of Highways, Com. of Ky., 822 F.2d 586, 596 (6th Cir. 1987) (holding that a regulation allowing signs related to on-premises activity meant "[n]on-commercial and commercial messages are permitted anywhere provided that an activity relating to the message is conducted on the premises."). The Court finds, however, that the Billboard Act's scheme also draws a line between two types of noncommercial speech—on- and off-premises messages. "This line has the effect of disadvantaging the category of noncommercial speech that is probably the most highly protected: the expression of ideas." Ackerley Commc'ns of Massachusetts, Inc. v. City of Cambridge, 88 F.3d 33, 37 (1st Cir. 1996). But with rare exceptions, the First Amendment does not permit the State to value certain types of noncommercial speech more highly than others, particularly when the speech disfavored includes speech, such as political speech, that is at the core of the First Amendment's value system. See id. For example, St. Jude Children's Research Hospital may display a sign relating to its cancer research or the annual St. Jude Memphis Marathon, but may not replace the content of that sign to say, "Vote for Referendum 72: providing housing to women and children of domestic abuse" or "Remember to Vote." Further, McDonalds may display its well-known golden arches, but may not display a sign that states, "Donate to your local library to promote and strengthen inner-city literacy." When posed with a similar scenario—where an on-premises Valero sign is changed from "Valero Honors Our Veterans.

Valero." to "Valero. Public corruption. TDOT Com. Schroer and Shawn Bible are Corrupt Officials"—Shawn Bible, Beautification Coordinator at TDOT, testified:

> I don't know the answer. I would have to think about that. I'm not sure. You really need it to connect to the business to be an advertising. Valero wants people to think of them as good Americans and support veterans and they think that builds business. I wouldn't think this would be a message that you could legitimately say would build business.

(Trial Tr., ECF No. 334 at PageID 6675:16-24 (referring to Exhibit 4).) Although Valero Energy Company's business is energy, and not veteran services or political activism, the State's agents use a sign's non-commercial content to determine if the content concerns on-premises activity. But even if the business's name is displayed, aligning itself with the content on the sign, the State may still find the content does not convey on-premises-related activity. Bible testified that on-premises activity should "be a message that would could legitimately say would build business," appearing to require that the content must serve a commercial purpose. Thus, the Court finds that adding a provision that non-commercial signs may be permitted wherever commercial signs are permitted would likely be as restrictive as the current Billboard Act provisions, because the constitutional issue here arises from the distinction between on-premises, non-commercial speech and off-premises, non-commercial speech.

### 7.     Minimum Distance Requirements

Seventh, the State argues that Thomas's minimum distance requirements for all signs fails for the same reasons his 500-foot distance requirement failed. (Id. at PageID 6804.) For the same reasons discussed above, the Court finds that a distance/spacing requirement does constitute a less restrictive alternative to the on-premises/off-premises distinction.

### 8.    Restricting Presentation Characteristics

Eighth, the State contends that Thomas "lacks standing to challenge" regulations pertaining to the size or other presentation characteristics.  (Id. at PageID 6804.)  As discussed previously, Thomas has standing to challenge the Billboard Act's on-premises/off-premises distinction.  It is unnecessary for Thomas to establish standing for his proposals of less restrictive means to the on-premises/off-premises distinction.  The State then argues that, "even if this Court were to find that the different size and presentation regulations were in fact improper, that would not help Plaintiff because the regulations preclude his sign no matter what size it is or what it looks like."  (Id. at PageID 6805.)  The State, once again, is confused.  Thomas is not challenging size- or presentation-related regulations.  He aims to propose a less restrictive alternative to the challenged on-premises/off-premises distinction that will also advance the State's interests.  For example, an alternative regulation may require all signs, regardless of content, to be a particular size, use a particular font (or a set of fonts), be limited to a particular colors, face a particular direction, or stand at a particular height, etc.  The Court finds that there are various content-neutral, presentation-related regulations that would be less restrictive than the Billboard Act's on-premises/off-premises distinction.  These presentation-related regulations would also advance the State's interests.  Signs could be required to be within the driver's zone of vision, thus reducing distracted driving.  A regulation could also require that signs be placed and sized in such a manner as to have less of an impact on aesthetics.  The Court, therefore, finds that presentation-related regulations could constitute an effective, less restrictive alternative.

Having found multiple effective, less restrictive means that would further the State's compelling interests, the Court finds the Billboard Act is not the least restrictive means to further the State's allegedly compelling interests.

In sum, the Court finds that even if the State's interests were compelling, the Billboard Act's exemption and exception provisions are not narrowly tailored to achieve their purpose because they are underinclusive and do not constitute the least restrictive means available.

## IV.    CONCLUSION

For the reasons stated above, the Court finds the Billboard Act is an unconstitutional, content-based regulation of speech.[12]

**IT IS SO ORDERED**, this 31st day of March, 2017.

 /s/ Jon P. McCalla
JON P. McCALLA
 UNITED STATES DISTRICT COURT JUDGE

---

[12]  The Court notes that if it were clear from the face of the statute that the Tennessee legislature would have enacted the Billboard Act with the unconstitutional on-premises/off-premises distinction omitted, the Court could sever the unconstitutional provisions while the Billboard Act's constitutional provisions stay in effect.  See Thomas v. Schroer, 116 F. Supp. 3d 869, 877 (W.D. Tenn. 2015) (quoting Memphis Planned Parenthood, 175 F.3d at 466 (quoting State v. Harmon, 882 S.W.2d 352, 355 (Tenn. 1994)).  The Court, however, is unpersuaded that the Billboard Act, as written, is severable in this manner.  See id.